# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### AT PADUCAH
### CIVIL ACTION NO. 5:06CV-P216-R

### [CAPITAL CASE]

ROBERT KEITH WOODALL                                    PETITIONER

v.

THOMAS L. SIMPSON                                    RESPONDENT

## I. INTRODUCTION

This matter is before the Court on Robert Keith Woodall's petition for a writ of habeas

corpus under 28 U.S.C. § 2254 (DN 6 ).  Woodall pleaded guilty to the charges of kidnapping,

raping, and murdering sixteen-year-old Sarah Hansen.  However, he contested that the

punishment of death should be imposed.  A jury trial on the appropriate sentence was conducted.

The jury sentenced Woodall to death for the murder and to life for the kidnapping and rape.

The crimes that Woodall admitted committing are revolting and despicable.  There is no

question that he planned to and did brutally and violently kidnap a young girl, savagely beat and

rape her, cut her throat twice with a box cutter, drag her while still alive several hundred yards,

and then throw her naked body into a freezing lake where she ultimately drowned.  There is also

no question that the victim and her family deserve justice.  However, ours is a system of law that

is concerned with justice for both the victim and the accused.  That system demands certain

rights be afforded to Woodall regardless of the cruelty and gruesomeness of his crimes.   The

duty of this Court is to determine whether, as a matter of law, Woodall received a

constitutionally sound sentencing hearing before he was condemned to death.   Such emotional

detachment may be difficult, but all agree it is "required."  The Court has taken such time as

needed to painstakingly perform such a review.

The Court has exhaustively reviewed the record below, the Magistrate Judge's Report and Recommendation, the parties' objections thereto, and the relevant case law. After doing so, the Court concludes that the requested writ should issue on claims one and two. The Court also finds that a certificate of appealability should issue with respect to claim five. On all other issues, the Court adopts the Magistrate Judge's Report and Recommendation, with modifications as discussed below.

## II. FACTUAL FINDINGS

The facts underlying Woodall's sentence are fully recounted in the Kentucky Supreme Court's decision on direct appeal. *Woodall v. Commonwealth*, 63 S.W.3d 104 (Ky. 2001). This Court presumes the state court's findings of fact to be correct. *See* 28 U.S.C. § 2254(e)(1). The Kentucky Supreme Court recited the facts underlying Woodall's death sentence as follows:

> The victim was a 16-year-old high school cheerleader, an honor student, a musician, a member of the National Honor Society and the Beta Club and a medalist in swimming and diving. On January 25, 1997, she had planned to watch a video with her boyfriend. She went to the local mini-mart to rent a movie, leaving her home between 7:30 p.m. and 8:00 p.m., never to be seen alive again by her family. At 10:42 p.m., two police officers were dispatched to search for the victim. Thereafter, they found the minivan that she had been driving in a ditch at Luzerne Lake, approximately 1.5 miles from the mini-mart. The officers followed a four to five hundred foot trail of blood on a gravel roadway from the van. The unclothed body of the victim was found floating in the water. Her throat had been slashed twice with each cut approximately 3.5 to 4 inches long. Her windpipe was totally severed. She actually died of drowning.

> The police questioned Woodall when they learned that he had been in the minimart on Saturday night. He gave two conflicting statements about his activities on the night of the murder after he left work. The police observed that Woodall was wearing a brand of tennis shoe similar to the imprint on the pier next to where the body of the victim had been found. His fingerprints were on the van the victim was driving. Blood was found on his front door and muddy and wet clothing under his bed. Blood on his clothing and sweatshirt were consistent with the blood of the

victim.  The DNA on the vaginal swabs was consistent with his.  His fingerprints were identified on the glass and door of the van as well as the interior doorjamb and handle.  On March 18, 1997, the Muhlenberg County Grand Jury indicted him for murder, kidnapping and rape. One week later, the Commonwealth announced its intention to seek the death penalty. Venue for the prosecution was changed from Muhlenberg to Caldwell County because of massive publicity.

*Woodall*, 63 S.W. 3d at 114.

### III.  PROCEDURAL HISTORY

On April 10, 1998, Woodall pleaded guilty to all charges and asked for judicial sentencing.  He later withdrew the judicial sentencing request, and a sentencing hearing before a jury commenced on July 14, 1998.  The sentencing hearing lasted six days.  The prosecution called eleven witnesses and the defense presented fourteen witnesses.  Woodall did not testify. At the conclusion of the sentencing hearing, the jury sentenced Woodall to death for the murder of Sarah Hansen.  The jury found the aggravating circumstance to be first degree rape committed during the commission of a kidnapping and murder.  The jury fixed Woodall's punishment for the kidnapping and rape at two consecutive life sentences.  The trial court followed the jury's sentencing recommendations and entered the final judgment of conviction and sentence of death on September 4, 1998.

Woodall filed a timely direct appeal with the Kentucky Supreme Court.  On direct appeal, Woodall raised twenty-eight assignments of error.  Woodall's sentence and convictions were upheld by the Kentucky Supreme Court on August 23, 2001, and made final on January 17, 2002. Justice Stumbo filed a dissenting opinion in which Justice Keller joined in part.  On October 7, 2002, the United States Supreme Court denied certiorari.  *Woodall v. Kentucky*, 537 U.S. 835 (2002).

On December 3, 2002, Woodall filed a Motion to Vacate and Set Aside Sentence of

Death under RCr 11.42.  On February 6, 2003, Woodall filed his first amended motion to vacate and set aside sentence of death under RCr 11.42.  On March 7, 2003, Woodall filed a second amendment to his RCr 11.42 motion along with a request for permission to amend.  On April 22, 2003, the Caldwell Circuit Court denied Woodall's motion to amend and his motion for relief. Woodall appealed the denial of his RCr 11.42 motion to the Kentucky Supreme Court.  The Kentucky Supreme Court affirmed the denial on November 23, 2005.  *Woodall v. Commonwealth*, No. 2003-SC-475-MR, 2005 WL 3131603 (Ky. Nov. 23, 2005).  On February 23, 2006, the Court denied a petition for rehearing.  Woodall filed a petition for certiorari with the United States Supreme Court.  On October 2, 2006, the Court denied the petition.  *Woodall v. Kentucky*, --U.S.--, 127 S.Ct. 280, 168 L.Ed.2d 214 (2006).

On June 1, 2004, Woodall filed a "motion for relief from judgment and sentence from death pursuant to CR 60.02(f)."  On October 4, 2004, the Caldwell Circuit Court entered an order denying Woodall's motion for relief pursuant to CR 60.02.  The Kentucky Supreme Court affirmed this denial on October 20, 2005.  *Woodall v. Commonwealth*, No. 2004-SC-0931-MR, 2005 WL 2674989 (Ky. Oct. 20, 2005).   The Kentucky Supreme Court denied a petition for rehearing on February 23, 2006.  Woodall filed a petition for certiorari with the United States Supreme Court.  On October 2, 2006, the Court denied the petition.  *Woodall v. Kentucky*, --U.S.--, 27 S.Ct. 266, 166 L.Ed.2d 206 (2006).

On December 28, 2006, Woodall filed this petition for writ of habeas corpus in the United States District Court, Western District of Kentucky.  In his petition for a writ of habeas corpus, Woodall raises the following thirty points of error: 1) the trial court refused to give a no adverse inference instruction; 2) the trial court failed to conduct a *Batson* hearing;

4

3) the trial court incorrectly excused veniremen Bessie Hopson and Richard Thompson for cause; 4) the trial court failed to strike six other veniremen for cause; 5) the trial court failed to properly instruct the jury on mitigation; 6) the verdict form was weighted in favor of death; 7) prosecutorial misconduct during closing arguments; 8) the trial court unduly restricted *voir dire* questioning; 9) the trial judge impermissibly considered Woodall's sex offender treatment report when it sentenced Woodall; 10) Woodall's guilty plea was involuntarily; 11) the trial judge incorrectly denied Woodall a continuance; 12) the trial judge improperly denied funding to conduct a positron emissions tomography ("PET") scan; 13) the trial judge erred in failing to hold a competency hearing; 14) the trial judge erred in not finding Woodall mentally retarded; 15) trial counsel were ineffective for failing to request a competency hearing; 16) trial counsel were ineffective for failing to raise mental retardation as an issue; 17) trial counsel were ineffective for forcing Woodall to plead guilty; 18) trial counsel were ineffective for failing to present additional mental health testimony in support of a third continuance; 19) trial counsel were ineffective for failing to present an insanity defense; 20) trial counsel were ineffective for failing to present a genetic defect defense; 21) trial counsel were ineffective for failing to pursue further neurological testing; 22-24) trial counsel were ineffective for failing to present enough mitigation evidence to convince the jury that Woodall did not deserve the death penalty; 25-26) a juror committed misconduct by consulting the Bible during deliberations; 27) the death penalty is a disproportionate punishment as applied to this case; 28) the trial judge impermissibly relied on non-statutory aggravators in sentencing Woodall; 29) Woodall is incompetent to be executed; and 30) cumulative errors rendered Woodall's trial fundamentally unfair.

This Court referred Woodall's petition to the Magistrate Judge for a Report and

Recommendation.  On January 30, 2008, the Magistrate Judge issued a Report and

Recommendation that Woodall's petition be denied.  With the exception of claim number

twenty-nine, Woodall objects to every conclusion reached by the Magistrate Judge.

## IV.  STANDARD OF REVIEW

When the parties to an action submit objections to the Magistrate Judge's Report and

Recommendation, the district court reviews the record *de novo*.  28 U.S.C. § 636(b)(1)(C) ("A

judge of the court shall make a *de novo* determination of those portions of the report or specified

proposed findings or recommendations to which objection is made.").  Review in this case is

governed by Chapter 153 of the Antiterrorism and Effective Death Penalty Act ("AEDPA") of

1996.  Under the AEDPA,

> (d) An application for writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a
> person in custody pursuant to the judgment of a State court, a determination of a
> factual issue made by a State court shall be presumed to be correct.  The applicant
> shall have the burden of rebutting the presumption of correctness by clear and
> convincing evidence.

28 U.S.C. § 2254.

The United States Supreme Court has interpreted the provisions regarding a state court

decision that is "contrary to" or an "unreasonable application of" clearly established federal law.

6

*See Williams v. Taylor*, 529 U.S. 362 (2000). In *Williams*, the Court determined that under the "contrary to" clause, a federal habeas court may grant a writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Id.* at 405. Under this standard, an unreasonable application is an objectively unreasonable application of the federal law set forth in decisions of the United States Supreme Court. A state court's ruling violates the "unreasonable application" clause "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. An unreasonable application can also occur where "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* Unreasonableness is an objective standard, and the fact that another court has applied the law in the same manner is not dispositive. *Id.* at 409-10. "Unreasonable" is distinct from "incorrect;" even if a state court incorrectly applies a rule of law, that error will not warrant habeas relief unless the application was objectively unreasonable. *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003). The Sixth Circuit has stated that "the district court could find the state court determinations unreasonable 'only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect,'" and its error "'would not be debatable among reasonable jurists.'" *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996)).

Under the AEDPA, "clearly established federal law" means "holdings, as opposed to the

7

dicta of [the Supreme] Court's decisions as of the time of the relevant state-court decision."
*Williams v. Taylor*, 529 U.S. at 412.  "'As is dictated by the statute, [reviewing courts] may not
look to lower federal court decisions in deciding whether the state decision is contrary to, or an
unreasonable application of, clearly established federal law.'"  *Smith v. Stegall*, 385 F.3d 993,
998 (6th Cir. 2004) (quoting *Doan v. Brigano*, 237 F.3d 722, 729 (6th Cir. 2001), abrogated on
other grounds by *Wiggins v. Smith*, 539 U.S. 510 ( 2003)).  Reviewing courts may consider such
lower federal court decisions, however, to the extent that such decisions reflect review and
interpretation of "'relevant Supreme Court case law to determine whether a legal principle or
right had been clearly established by the Supreme Court case law.'"  *Id.* (quoting *Hill v.
Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003)).  In this Circuit, reviewing courts are "also bound
by any prior Sixth Circuit decisions concluding that federal law on a particular issue has been
'clearly established' by certain holdings of the Supreme Court."  *Id.* (citing Rule 206(c) of the
Sixth Circuit Rules).

    Even where the state court decision does not specifically cite to relevant federal case law,
the deferential AEDPA review standard applies.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (holding
that the state court is not required to cite United States Supreme Court cases, or even be aware of
them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the
state-court decision contradicts them").  However, the deferential standard of the AEDPA does
not apply where the state court has not adjudicated the merits of the particular claim.  *Clinkscale
v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004) (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th
Cir. 2003) ("Where as here, the state court did not assess the merits of a claim properly raised in
a habeas petition, the deference due under AEDPA does not apply.") (citing *Wiggins v. Smith*,

539 U.S. at 537-38)).  In that instance, the claim is reviewed *de novo.  Id.*

To the extent that a habeas petitioner challenges the factual findings of the state court, § 2254(e)(1) provides that "determination of a factual issue by a State court shall be presumed to be correct" and that "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding.  28 U.S.C. § 2254(b) & (c)).  A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on his or her claims.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  If the petitioner still has a remedy in the state courts in which the state court would have the opportunity to rule on the federal constitutional claims in petitioner's case, exhaustion has not occurred.  *Rust v. Zent*, 17 F.3d at 160.  At the current juncture, the Court sees no apparent exhaustion problems with the petition in this case and does not engage in a *sua sponte* analysis of exhaustion where Respondent has failed to raise it.

Habeas petitioners face an additional hurdle before federal courts may review a question of federal law decided by a state court.  As applied in the habeas context, the doctrine of procedural default prevents federal courts from reviewing claims that a state court has declined to address because of a petitioner's noncompliance with a state procedural requirement.  In *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), the United States Supreme Court held that, for purposes of comity, a federal court may not consider "contentions of federal law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required

9

by state procedure."  Additionally, the Supreme Court held in *Coleman v. Thompson*, 501 U.S.

722, 749 (1991), that:

> [If a] state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

The Sixth Circuit has adopted a four-part test for determining whether a claim has been

procedurally defaulted:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim . . . [Fourth,] the petitioner must demonstrate under [*Wainwright v.*] *Sykes*, 433 U.S. 72 (1977) that there was "cause" for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Caver v. Straub*, 349 F.3d 340, 346 (6th Cir. 2003) (quoting *Maupin v. Smith*, 785 F.2d 135, 138

(6th Cir. 1986)).

Finally, the Court notes that in *Teague v. Lane*, 489 U.S. 288, 311-13 (1989), the

plurality barred the application of new procedural rulings in the collateral review of convictions

that became final before those rulings were announced.  A conviction becomes final for the

purposes of *Teague* when "the availability of direct appeal to the state courts has been exhausted

and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has

been finally denied."  *Beard v. Banks*, 542 U.S. 406, 411 (2004) (quoting *Caspari v. Bohlen*, 510

U.S. 383, 390 (1994) (internal quotation marks omitted)).  The *Teague* opinion, however,

delineated two exceptions.  The first, which is not pertinent to this controversy, is that "a new

10

rule should be applied retroactively if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" *Teague v. Lane*, 489 U.S. at 311 (internal citations omitted).  The second exception is for "new 'watershed rules of criminal procedure' that are necessary to the fundamental fairness of the criminal proceeding" and improve the accuracy of the criminal process.  *Gaines v. Kelly*, 202 F.3d 598, 604 (2d Cir. 2000) (quoting *Sawyer v. Smith*, 497 U.S. 227, 241-42 (1990) (quoting *Teague v. Lane,* 489 U.S. at 311)).

With these guiding principles in mind, the Court will now address Woodall's petition and his objections to the Magistrate Judge's Report and Recommendation.

## IV. ANALYSIS

### A.    NO ADVERSE INFERENCE INSTRUCTION

Woodall did not testify at the penalty phase.  As a result, he requested the trial judge to instruct the jury that he had no obligation to testify and that no adverse inference could be drawn from his failure to do so.  The Commonwealth did not object.  The trial judge, however, refused to give the instruction:

> THE COURT: --the tendered instruction.  It was on my desk.  I guess it's still there. The defendant has tendered an instruction to be given at this sentencing stage on the defendant's right not to testify, and I'm going to refuse that tendered instruction.  It is marked and tendered, and I think I need to state my grounds for the record.  I don't think the Commonwealth has objected to it being read is that correct?

> PROSECUTOR:  That is correct, your honor.

> THE COURT:  And the Court--it might be an easy way out to go ahead and give it, except, I don't think [it's] intellectually honest and I don't think it's in keeping with the case law as far as sentencing is concerned.  The Court has the responsibility of not just giving instructions to juries just for the sake of protecting the record and being beyond an abundance of caution.  It's the responsibility of the Court not only to be a gatekeeper of evidence, but also to be fair on the law.  This defendant has

11

waived his right to self-incrimination and has entered pleas of committing the crimes of rape and murder and kidnapping and has asked the jury to set his sentence.  The Court is aware of no case law that precludes the jury from considering the defendant's lack of explanation of remorse or explanation of the crime or anything else once guilt has been adjudged in sentencing.  . . . ***I just don't think that it's appropriate to instruct the jury that the failure of the defendant to take the stand when he stands convicted of these very serious crimes is in keeping with the law.***

. . .

There's no question I'd give it if we were talking about guilt or innocence.  In the sentencing stage to me it defies logic, it defies common sense, it's not intellectually honest to tell this jury . . . that you go out and rape and murder and kidnap and admit to it and then offer no testimony, no explanation, no asking for forgiveness, no remorse, and the jury can't consider that.  I just don't think its logical, so that's why I'm not going to give it.

TE 12 at 1588-92 (emphasis added).

Woodall argues that the trial court's failure to instruct the jury as requested violated his

Fifth and Fourteenth Amendment rights.  On direct appeal, the majority of the Kentucky

Supreme Court rejected Woodall's claim as follows:

Woodall pled guilty to all of the charged crimes as well as the aggravating circumstances.  The no adverse inference instruction is used to protect a nontestifying defendant from seeming to be guilty to the jury because of a decision not to testify. That is not the situation presented here.  The instruction contemplated by *Carter v. Kentucky*, 450 U.S. 288 (1981), could not have changed the outcome of a guilty determination that the defendant acknowledged by his admission of guilt.  There was no reason or need for the jury to make any additional inferences of guilt.

There is no error in this respect.  Any possible error would be nonprejudicial because the defendant admitted the crimes and the evidence of guilt is overwhelming.  Woodall claims that *Estelle v. Smith*, 451 U.S. 454 (1981), extended Fifth Amendment protection and thus the *Carter, supra*, rule to the penalty phase of a trial.  *Estelle, supra*, is not a jury instruction case, unlike *Carter*.  *Estelle* does not cite to *Carter* or indicate that *Carter* has been extended.  The factual situation in *Estelle* is different from that presented in this case because it involved the use of an out-of-court statement the defendant made to a government expert.  The statement in that case was in regard to a psychological examination by the government prosecutors which was used against the defendant without warning in the penalty trial.  Neither *Carter* nor *Estelle* involved a guilty plea.  Here, Woodall admitted

guilt to all charges and did not contest the facts.  He was not compelled to testify so there were no words that could be used against him so as to implicate the Fifth Amendment privilege as in *Estelle*.

Woodall contends that *Mitchell v. United States*, 526 U.S. 314 (1999), permits a guilty plea which does not waive the privilege against self-incrimination at the sentencing phase.  *Mitchell*, *supra*, does not apply here.  In *Mitchell*, the defendant pled guilty to federal charges of conspiring to distribute five or more  kilograms of cocaine and of distributing cocaine within 1000 feet of a school or playground.  She reserved the right to contest the amount of the cocaine at the penalty phase.  The amount of the cocaine would determine the range of penalties.  She only admitted that she had done "some of" the conduct charged.  She did not testify.  Three other codefendants did testify as to the amount of cocaine she had sold.  Ultimately, the U.S. Supreme Court ruled that it would not permit a negative inference to be drawn about her guilt with regard to the factual determination respecting the circumstances and details of the crime.  Here, Woodall did not contest any of the facts or aggravating circumstances surrounding the crimes.

The decision of the trial court not to give an adverse inference instruction does not amount to constitutional error so as to require reversal.  There is no violation of any section of the United States or Kentucky Constitution.

*Woodall*, 63 S.W. 3d at 115.

Justice Stumbo dissented as follows:

Respectfully, I must dissent from the majority opinion.  My primary disagreement with the majority stems from the ruling that there was no error in the failure of the trial court to instruct the jury that no adverse inference should be drawn from Appellant's decision not to testify during the penalty phase of the trial.  The majority opinion states that this is not an error because Appellant entered a guilty plea to the charges and the evidence of guilt was overwhelming. Because he pled guilty, according to the majority, a no adverse inference instruction could have no effect on a determination of guilt and, thus, no negative inferences could be drawn by the jury from Appellant's silence.

The plain language of *Mitchell v. United States*, 526 U.S. 314 (1999), disputes the conclusion reached by the majority.  Therein, the United States Supreme Court stated as follows:

> The rule against adverse inferences from a defendant's silence in criminal proceedings, including sentencing, is of proven utility.  Some years ago the Court expressed concern that "too many, even those who should be better advised, view this privilege as a shelter for

wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege." . . . There can be little doubt that the rule prohibiting an inference of guilt from a defendant's rightful silence has become an essential feature of our legal tradition. . . . The rule against adverse inferences is a vital instrument for teaching that the question in a criminal case is not whether the defendant committed the acts of which he is accused. The question is whether the Government has carried its burden to prove its allegations while respecting the defendant's individual rights. The Government retains the burden of proving facts relevant to the crime at the sentencing phase and cannot enlist the defendant in this process at the expense of the self-incrimination privilege.

*Mitchell*, 526 U.S. at 329, quoting *Ullmann v. United States*, 350 U.S. 422 (1956).

The majority would have us eradicate the important Constitutional right involved here by failing to require the trial court to give the requested instruction. The majority states that the instruction is not necessary because Woodall did not contest any of the facts or aggravating circumstances surrounding the crimes. That may be so, but Appellant did contest the sought penalty of death during his penalty phase trial. He cross-examined the eleven witnesses presented by the Commonwealth and presented fourteen witnesses of his own who testified about Appellant's life and the effects his upbringing had on him. As noted in *Mitchell*, 526 U.S. at 327, "it appears that in this case, as is often true in the criminal justice system, the defendant was less concerned with the proof of [his] guilt or innocence than with the severity of [his] punishment." For Appellant herein the stakes could not have been higher and his Fifth Amendment rights could not have been more important.

*Woodall*, 63 S.W.3d at 134-35.

The Magistrate Judge concluded that the Kentucky Supreme Court properly applied United States Supreme Court precedent in rejecting this claim. As explained below, this Court disagrees with that conclusion.

The Fifth Amendment's command that no person should be compelled to be a witness against himself in a criminal proceeding is applicable against the States through the Fourteenth Amendment. *See Malloy v. Hogan*, 378 U.S. 1, 3 (1964). The Supreme Court first considered the right to a no adverse inference instruction in *Carter v. Kentucky*, 450 U.S. 288, 302 (1981).

14

In *Carter*, the defendant was sentenced to twenty years for burglary.  At his trial, the trial judge refused to instruct the jury that the defendant's failure to testify could not be used as an inference of guilt.  The Supreme Court granted certiorari to determine whether upon request a defendant has a right under the Fifth and Fourteenth Amendments to a no adverse inference instruction.  *Id.* at 290.  The *Carter* court began its analysis by observing that "instructing a jury in the basic constitutional principles that govern the administration of criminal justice is often necessary." *Id.* at 302 (internal citations omitted).  The Court went on to explain:

> A trial judge has a powerful tool at his disposal to protect the constitutional privilege -- the jury instruction -- and he has an affirmative constitutional obligation to use that tool when a defendant seeks its employment.  No judge can prevent jurors from speculating about why a defendant stands mute in the face of a criminal accusation, but a judge can, and must, if requested to do so, use the unique power of the jury instruction to reduce that speculation to a minimum.

*Id.* at 303.  Accordingly, the *Carter* court held that "a state trial judge has the constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify" by giving a no adverse inference instruction.  *Id.* at 305.

Two months following *Carter*, in *Estelle v. Smith*, 451 U.S. 454, (1981), a capital case, the Court considered the issue of whether in a bifurcated trial the defendant retains a Fifth Amendment right through the sentencing phase.  Prior to trial the defendant in *Estelle* was required to undergo a psychiatric examination.  During the penalty phase, the doctor who administered the examination was called by the prosecution to testify about the defendant's future dangerousness.  The defendant argued that the testimony violated his Fifth and Fourteenth Amendment rights against self-incrimination because he was not advised of those rights prior to the psychological examination.  The state argued that the defendant was not

15

entitled to the protection of the Fifth Amendment because the testimony was used only to

determine punishment after conviction, not to establish guilt.  The Supreme Court held that

there was "no basis to distinguish between the guilt and penalty phases of respondent's capital

murder trial so far as the protection of the Fifth Amendment privilege is concerned.  Given the

gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation

to observe fundamental constitutional guarantees."  *Id.* at 462-63.  Accordingly, because the

defendant's Fifth Amendment rights were violated during the sentencing phase, the Court

vacated the defendant's death sentence.

   Also relevant is *Mitchell v. United States*, 526 U.S. 314 (1999).  Mitchell pleaded guilty

to federal drug charges, but reserved the right at sentencing to contest the drug quantity.  At the

sentencing hearing, the judge ruled that as a consequence of her guilty plea Mitchell had no right

to remain silent with respect to the details of her crime.  The judge told Mitchell, "'I held it

against you that you didn't come forward today and tell me that you really only did this a couple

of times . . . . I'm taking the position that you should come forward and explain your side of this

issue.'"  *Id.* at 319.   Mitchell's case presented the Supreme Court with two questions relating to

a criminal defendant's Fifth Amendment privilege against self-incrimination:  1) whether in the

federal criminal system, a guilty plea waives the privilege in the sentencing phase of the case,

either as a result of the colloquy preceding the plea or by operation of law when the plea is

entered; and 2) whether, in determining facts about the crime which bear upon the severity of the

sentence, a trial court may draw an adverse inference from the defendant's silence.

   The *Mitchell* Court began its analysis of the first question by observing that it was

already well-established through *Estelle* that in a bifurcated proceeding the Fifth Amendment

right against self-incrimination survives even though guilt has been already been determined.

While the Court observed that "where there can be no further incrimination, there is no basis for

the assertion of the privilege," it limited this principle "to cases in which the sentence has been

fixed and the judgment of conviction has become final."  *Mitchell v. United States*, 526 U.S. at

314.  The *Mitchell* Court then explained:

> Where the sentence has not yet been imposed a defendant may have a legitimate fear
> of adverse consequences from further testimony.   As the Court stated in *Estelle*:
> "Any effort by the State to compel [the defendant] to testify against his will at the
> sentencing hearing clearly would contravene the Fifth Amendment."   451 U.S. at
> 463.  *Estelle* was a capital case, but we find no reason not to apply the principle to
> noncapital sentencing hearings as well. "The essence of this basic constitutional
> principle is 'the requirement that the State which proposes to convict and punish an
> individual produce the evidence against him by the independent labor of its officers,
> not by the simple, cruel expedient of forcing it from his own lips.'" 451 U.S. at 462
> (emphasis in original) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 581-82
> (1961)). . . . [I]t appears that in this case, as is often true in the criminal justice
> system, the defendant was less concerned with the proof of her guilt or innocence
> than with the severity of her punishment. ***Petitioner faced imprisonment from one
> year upwards to life, depending on the circumstances of the crime. To say that she
> had no right to remain silent but instead could be compelled to cooperate in the
> deprivation of her liberty would ignore the Fifth Amendment privilege at the
> precise stage where, from her point of view, it was most important.***

*Id.* at 329-30 (emphasis added).  Thus, the *Mitchell* court held that the Fifth Amendment applies

in the sentencing phase even if the defendant has pleaded guilty.

The *Mitchell* Court then confronted the question of whether Mitchell's sentencing judge

acted contrary to the Constitution when he held her failure to testify against her.  Relying on

*Estelle* and *Griffin v. California*, 380 U.S. 609 (1965)[1], the Court reaffirmed that:

> The concerns which mandate the rule against negative inferences at a criminal trial

---

[1]In *Griffin*, the United States Supreme Court held that the self-incrimination guarantee of the
Fifth Amendment, in its bearing on the states by reason of the Fourteenth Amendment, forbids either
comment by the prosecution on an accused's silence or instructions by the court that such silence is
evidence of guilt.

> apply with equal force at sentencing.  Without question, the stakes are high:  Here, the inference drawn by the District Court from petitioner's silence may have resulted in decades of added imprisonment. The Government often has a motive to demand a severe sentence, so the central purpose of the privilege -- to protect a defendant from being the unwilling instrument of his or her own condemnation -- remains of vital importance.

*Mitchell v. United States,* 526 U.S. at 329.  Thus irrespective of the plea, the Court held that: "By holding petitioner's silence against her in determining the facts of the offense at the sentencing hearing, the District Court imposed an impermissible burden on the exercise of the constitutional right against compelled self-incrimination." *Id.* at 330.

In sum, *Carter* established that under the Fifth Amendment a defendant has the right to receive a no adverse inference instruction if one is requested.  *Estelle* clarified that a capital defendant retains his Fifth Amendment right to remain silent during sentencing, even if guilt has already been established.  And, *Mitchell* affirmed that the Fifth Amendment right to remain silent, including the prohibition against negative inference, remains intact through sentencing, even where a defendant pleads guilty to the substantive offense.  When these three cases are read together, as they must be, there is but one reasonable conclusion that can be reached--a capital defendant has a Fifth Amendment right to a no adverse inference instruction during the sentencing phase of a trial, even if guilt has already been established through a plea agreement.

In recommending that the Court reject this claim, the Magistrate Judge focused on a passage from *Mitchell* in which the Court stated:  "Whether silence bears upon the determination of a lack of remorse, or upon acceptance of responsibility for purposes of the downward adjustment provided in § 3E1.1 of the United States Sentencing Guidelines (1998), is a separate question.  It is not before us, and we express no view on it." *Mitchell v. United States*, 526 U.S. at 330.  From this passage, the Magistrate Judge concluded that it was not *per se* impermissible

18

for the jury to consider Woodall's lack of remorse in sentencing him to death.  While this *might*

be the case, it is not the precise issue before the Court.[2]  The issue before the Court is whether

Woodall was entitled to a no adverse inference instruction.  Unquestionably, Woodall was

entitled to it.  In this case, Woodall pleaded guilty to the underlying substantive offenses.  He did

not, however, agree that the sentence of death was appropriate.  Instead, he retained the right to

have his sentence determined by a jury of his peers.  His Fifth Amendment right survived his

guilty plea.  *Mitchell v. United States*, 526 U.S. at 327.  The government could not have

---

[2]The Magistrate Judge also relied on a smattering of other opinions.  However, none
involve the issue faced by this Court.  First, in *Issacs v. Head*, 300 F.3d 1232 (11th Cir. 2002),
the government called a reporter to the stand to testify against the defendant.  The reporter
testified that during an interview the defendant stated that he would commit the crime again if he
had it to do all over.  The trial court then instructed the jury that they could consider "all aspects
of the defendant's character, including but not limited to, . . . any evidence of remorse or lack
thereof."  *Id.* at 101.  The *Issacs* court held that the defendant's rights were not violated because
the instruction and the government's closing arguments were based on other evidence (primarily
the reporter's testimony), *not the defendant's silence at trial*.  *Id.* at 1271 ("We believe that this
is such a case in which the Georgia Supreme Court reasonably could conclude that the
arguments and comments concerning Isaacs' lack of remorse did not implicate the right not to
testify.").  Likewise*, Hemby v. Hannigan*, 117 F. Supp. 2d 1057 (D. Kan. 2000) and *Burr v.
Bertrand*, No. 04-C-992, 2007 U.S. Dist. LEXIS 80805 (E.D. Wis. Oct. 31, 2007), did not
involve an adverse inference instruction.  The district court in *Hemby* accepted the state court's
factual finding that the trial court did not actually rely on defendant's silence in sentencing.  *Id.*
("In the present case, the Kansas Supreme Court upheld the sentence of 15 years to life, finding
the trial court's reliance on petitioner's lack of remorse was indicated by sentencing evaluation
and other reports in the record, and not defendant's silence at sentencing.  Because this decision
is supported by the record, and is not contrary to or an unreasonable application of Supreme
Court precedent, petitioner is entitled no relief on this claim.").  The district court in *Burr*
reached a similar conclusion:  "It appears that the court's conclusion regarding Burr's lack of
remorse rested upon circumstances other than Burr's exercise of his right to silence.  Therefore,
Burr fails to demonstrate that his right to against self incrimination was violated by the sentence
imposed."  The Magistrate Judge also cited *Emmett v. True*, No. 7:05cv00329, 2006 U.S. Dist.
LEXIS 11125 (W.D. Va. Jan. 27, 2006).  Unlike the present case, the trial judge in *Emmett*
affirmatively instructed the jury not to consider Emmett's failure to testify.  The issue in *Emmett*
was whether the jury disobeyed the instruction.  The issue in this case is fundamentally different
than the issues decided in the above-cited cases.

compelled Woodall to testify against his will at his sentencing hearing.  *Estelle v. Smith*, 451 U.S. at 454.  Such conduct would have undoubtedly violated his Fifth Amendment right.  *Id.*  Woodall requested a no adverse inference instruction.  Once requested, it should have issued.  *Carter v. Kentucky*, 450 U.S. at 305.  The trial judge could have given the requested instruction and prevented any undue and impermissible speculation by the jury.  Even though the prosecution did not object to the instruction, the trial judge refused to issue it.  In doing so, he ran afoul of clearly established constitutional principles and violated Woodall's constitutional rights.  This is not a new rule of law as the Commonwealth argues.  To the contrary, it is a logical application of then-existing Supreme Court precedent.  And, the Kentucky Supreme Court's decision to reject this claim was an unreasonable application of *Carter*, *Estelle*, and *Mitchell.*

The Commonwealth argues that even so, the requested writ should not issue because any error in this regard was "harmless."  For purposes of federal habeas corpus review, a constitutional error that implicates trial procedures shall be considered harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht  v. Abrahamson*, 507 U.S. 619, 637 (1993).  The United States Supreme Court recently reaffirmed use of the *Brecht* standard "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman [v. California*, 386 U.S. 18 (1967)]. . . ."  *Fry v. Pliler*, --U.S.--, 127 S. Ct. 2321, 2328, 168 L. Ed. 2d 16 (2007).  This standard also applies to constitutional errors in the sentencing process.  *Stewart v. Erwin*, 503 F.3d 488, 501 n.5 (6th Cir. 2007).

When applying the *Brecht* standard, rather than place a burden on a party to prove or

disprove an error's effect or influence on the verdict, the Supreme Court has clarified that it is for the judge sitting on habeas review to decide whether the error so influenced the verdict. *O'Neal v. McAninch*, 513 U.S. 432, 435-38 (1995).  If the judge is sure that the error had no or very slight effect or influence, the verdict and judgment must stand.  *Id.*  However, if "the matter is so evenly balanced" that the judge has grave doubts as to whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, the judge must treat the error as if it did and grant the habeas writ.  *Id.* at 435.

The Supreme Court has noted, however, that certain errors implicating fundamental constitutional process may require the reversal of a conviction without resorting to a harmless-error analysis.  *Brecht v. Abrahamson*, 507 U.S. at 638 n.9.  The Court thus divided constitutional errors into two classes:  1) "trial errors," which occurred during presentation of the case to the jury and whose effect may be "'quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt'"; and 2) "structural defects," which "'defy analysis by "harmless-error" standards'" because they "'affec[t] the framework within which the trial proceeds,'" rather than being "'simply an error in the trial process itself.'"  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148  (2006).

In *Carter*, the Supreme Court observed that "it is arguable that a refusal to give an instruction similar to the one that was requested here [a no adverse inference instruction] can never be harmless."  *Carter v. Kentucky*, 450 U.S. at 304.  Nevertheless, the *Carter* court declined to reach the issue because it had not been presented to or considered by the lower court. This Court is inclined to agree with the *Carter* court that it is doubtful whether an error of this

21

magnitude can ever be harmless.  Nevertheless, out of an abundance of caution, the Court will engage in a harmless error analysis.

The Commonwealth argues that the failure to give the no adverse inference instruction was "harmless" because Woodall admitted the statutory aggravators necessary to impose the death penalty.  This argument would be persuasive if the finding of the aggravators required imposition of the death penalty.  It did not.  The jury was free to reject the death penalty even if it found the existence of aggregating circumstances beyond a reasonable doubt.  Thus, even though Woodall admitted all the elements necessary for the jury to impose the death penalty, he requested the jury not to do so.  In the absence of a no adverse inference instruction, the jury may have based its decision to sentence Woodall to death in part on his failure to testify. Certainly, this is a reasonable conclusion, and one the Court cannot rule out.  This is especially true given the fact that the trial judge so forcefully stated on the record that he felt that the jury could consider Woodall's failure to offer an explanation for the crimes.  If the trial judge, a man trained in the law, held this fact against Woodall then it is possible, indeed probable, that the jury did so as well.  The Court cannot say for certain that the jury did not.  "If a habeas court is in 'grave doubt' as to the harmlessness of an error, the habeas petitioner must prevail."  *Bates v. Bell*, 402 F.3d 635, 649 (6th Cir. 2005) (citing  *O'Neal v. McAninch*, 513 U.S. at 436). Accordingly, the Court must presume the error was not harmless.

The Court concludes that the Commonwealth violated Woodall's Fifth Amendment right (made applicable to the states via the Fourteenth Amendment) by refusing to give a no adverse inference instruction after Woodall's counsel requested it.  The Kentucky Supreme Court's rejection of this claim is an unreasonable application of *Carter*, *Estelle*, and *Mitchell*.

22

Therefore, the Court must grant Woodall's petition for a writ of habeas corpus on this ground.

## B.   THE *BATSON* OBJECTION

Woodall claims that his Fifth, Eighth, and Fourteenth Amendment rights were violated when the trial court allowed the Commonwealth to use a peremptory challenge to strike an African-American member of the jury pool, Carla Diggs.  During the questioning of Woodall's jury pool, both the trial court and counsel questioned Ms. Diggs.  She stated that she had not heard anything about the case prior to being called for jury duty.  She also stated without hesitation that she could consider the entire range of penalties and that she would listen to the evidence presented by both sides before reaching a decision.  She concluded by stating, "I think I can be fair."  TE 5 at 667-77.  At the end of this questioning, neither the prosecution nor defense moved to strike Ms. Diggs for cause.   However, the Commonwealth used one of its peremptory strikes to exclude Ms. Diggs, the only remaining African-American, from the jury pool.  Woodall objected under *Batson v. Kentucky*, 476 U.S. 79 (1986).  Thereafter, the following colloquy took place between counsel and the trial court:

> DEFENSE COUNSEL:  We also want to make a motion regarding the jury under Batson.  We had one African-American juror left in the pool, and I asked Mr. Vick to tender his --well, his strike sheet has been tendered, and I'm assuming that that juror was struck, and therefore, we think there's no racial mix on the jury and that that's a violation of that case.
> . . .
>
> PROSECUTOR:  In response to the Batson [objection], I have attempted to print, and I think its legible, my reason for that particular strike under Batson.  If the Court could need a further explanation, I'll be glad to state at this time that the juror questionnaire stated that she did not trust anyone.  There were several other responses of negative statements and her questionnaire was the basis for the Commonwealth's  strike of that particular juror.
>
> THE COURT:  The record should reflect, because it's color blind, that this defendant is white.

23

> DEFENSE COUNSEL:  I understand that, Judge, but I think we've still got the right to raise that issue.
>
> . . .
>
> THE COURT: I don't know whether you do or not, but anyway the objection is noted, and counsel is correct that I am allowing them to defer until after the opening statements for their objections they had regarding some other matters.

TE 8 at 1165-66.

On direct appeal, the majority of the Kentucky Supreme Court rejected this claim as follows:

> Woodall argues that he was denied due process and equal protection of the law because the trial judge failed to conduct an inquiry into and make findings of fact concerning the alleged discriminatory intent and credibility of the reasons given by the prosecutor for a peremptory challenge of the only African American in the final jury pool.  At the conclusion of the *voir dire* examination, only one African American remained in the jury pool.  The other African American called for jury duty had been challenged and removed for cause.  No motion was made to strike the remaining juror for cause but the prosecution exercised a peremptory strike against her.  In a response to an objection by the defense, the prosecutor stated that the juror had been struck because she answered a question on a jury questionnaire to the effect that she "did not trust anyone."  Woodall contends that the prosecution struck the juror solely because of her race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).
>
> In *Batson*, *supra*, the United States Supreme Court promulgated a three step process for determining whether peremptory challenges had been properly exercised.  First, a defendant must establish a *prima facie* case of racial discrimination.  Second, the prosecutor must provide a race neutral reason for the exercise of the peremptory challenge, and third, the trial court is to conduct an inquiry into the ultimate question of whether there was discriminatory intent in the exercise of the peremptory challenge.  Our examination of the record in this case indicates that the justification for striking peremptorily the one remaining African American juror was not a pretext for racial discrimination.  The Commonwealth can rely on a jury questionnaire to derive its race neutral reasons for striking a juror.  *Commonwealth v. Snodgrass*, Ky., 831 S.W.2d 176 (1992).  An attitude of mistrust expressed on a juror questionnaire should be given the same weight as an attitude of mistrust or bias expressed by a juror on *voir dire* examination.  *Batson* was not intended to remove all prosecutorial discretion as to the use of peremptory challenges but only to eliminate the obviously bad practice of eliminating potential jurors because of their

race only.   The evaluation of whether the offered reasons for a prosecutorial challenge remains in the sound discretion of the trial judge.  *See U.S. v. McMillon*, 14 F.3d 948 (4th Cir. 1994), which stated in part that the trial court, present on the scene, found the reasons articulated were both nondiscriminatory and actual.  Under all the circumstances, the trial judge did not abuse his discretion by rejecting the *Batson* challenge.
*Bell-Bey v. Roper*, 499 F.3d 752 (8th Cir. Mo. 2007).

*Woodall*, 63 S.W.3d at 120-21.

Justices Stumbo and Keller dissented as follows:

Finally, as to the *Batson* challenge, I would have remanded this case to the trial court for a hearing at which time the Court should conduct an inquiry into the ultimate question of whether there was discriminatory intent in the exercise of the peremptory challenge.  None was held and there was no ruling by the trial court on the legitimacy of the prosecution's explanation because the trial court apparently, and erroneously, believed that because Appellant was white, he had no ground to object to the exclusion of the sole black juror remaining in the venire.   "[A] criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same race."   *Powers v. Ohio*, 499 U.S. 400, 402 (1991).

*Id.* at 134.

The Magistrate Judge concluded that the majority of the Kentucky Supreme Court decided this claim correctly.  For the reasons explained below, this Court disagrees.

The Constitutional guarantee of equal protection ensures that a party may not exercise a peremptory challenge to remove an individual on account of that person's race.  *See Batson v. Kentucky,* 476 U.S. at 79.  Because jury service represents "a significant opportunity to participate in civic life," white defendants, such as Woodall, have standing to assert the equal protection rights of excluded black venire persons.  *Powers v. Ohio*, 499 U.S. 400, 409 (1991); *Echlin v. LeCureux*, 995 F.2d 1344, 1348 (6th Cir. 1993) ("White defendants are now accorded the same equal protection right as minority defendants to prevent the systematic exclusion of minority jurors.").  In *Purkett v. Elem*, 514 U.S. 765 (1995), the Supreme Court set forth the

25

required analysis under *Batson*:

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a *prima facie* case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two).  If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination. The second step of this process does not demand an explanation that is persuasive, or even plausible.  At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation.   Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

*Id.* at 767-68 (citations omitted) (alteration in original).  The "evaluation of a prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).  "In considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder v. Louisiana*, --U.S.--, 128 S. Ct. 1203, 1208 (2008).

In this case, it is clear from a review of the transcript that the trial court did not undertake the required *Batson* analysis or even allow the parties the opportunity to adequately develop the record with respect to this objection.  This failure was apparently due to the fact that the trial court doubted that Woodall, a white defendant, had the right to make a *Batson* objection.  The trial court's failure to articulate any meaningful finding on the record is significant.  In *United States v. Harris*, 192 F.3d 580 (6th Cir. 1999), the Sixth Circuit held that a district court's failure to engage in any type of analysis of the prosecutor's motivation constituted reversible error justifying a remand for further inquiry on the *Batson* question.  There, the district court denied the *Batson* challenge because the jury already contained one African-American and because the

panel members who were the basis of the *Batson* objection would serve as alternates, rather than actual jurors.  The Sixth Circuit rejected the district court's reasoning and found that the district court's reliance on impermissible factors, such as the jury's composition, left it with no choice but to reverse.  *Id.* at 588.

"In reviewing Petitioner's *Batson* claim, which presents a mixed question of law and fact, our review necessarily focuses on the reasonableness of the decisions of the state courts--that is, whether those decisions constituted an unreasonable application of Supreme Court precedent." *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).  The Kentucky Supreme Court's decision is an unreasonable application of *Batson* and its progeny.  The Kentucky Supreme Court ignored the fact that the trial judge did not conduct the required *Batson* analysis or even recognize that Woodall had the right to make a *Batson* objection.  The trial court's failure to do so was based on its incorrect belief that Woodall was not entitled to rely on *Batson* because he was white.  This Court concludes that any other reading of the transcript is unreasonable.

Citing *Rice v. Collins*, 546 U.S. 333, 338-39 (2006), the Commonwealth asserts that it makes no difference that the trial court did not conduct a *Batson* analysis because the Kentucky Supreme Court concluded on direct review that race was not a motivating factor in the prosecution's decision to strike Ms. Diggs.  In *Rice,* however, the Supreme Court explicitly pointed out that nothing about the state court of appeal's review "suggested the trial court failed to conduct a searching inquiry of the prosecutor's reasons for striking [the juror]." *Id.*  Here, that cannot be said.  The record demonstrates that the trial court did not conduct a *Batson* inquiry. The trial judge stated that Woodall was white, indicated that he was doubtful Woodall had the right to rely on *Batson*, noted the objection for the record, and moved on.  The record related to

27

this claim was never fully developed because the trial judge did not recognize Woodall's right to make a *Batson* objection.

This case is more akin to *Harris v. Haeberlin*, 526 F.3d 903 (6th Cir. 2008). In *Harris*, the defense team discovered evidence of a videotaped conversation among the prosecutorial team as it was discussing the exercise of its peremptory challenges. This evidence was not considered by the trial court when it conducted its *Batson* analysis because it was not known at that time. On appeal, the Kentucky Supreme Court reviewed the tape and determined that no *Batson* violation had occurred. Distinguishing *Rice*, the Sixth Circuit held that: "In a case such as the one before us . . . where the appellate court has before it new evidence providing direct information about the prosecutor's state of mind, clearly established federal law regarding the trial court's superiority in making credibility determinations in a *Batson* hearing persuades us that a remand is appropriate." *Id.* at 912.

The trial court did not give any serious consideration to Woodall's *Batson* objection. Having only the trial transcript before it, the Kentucky Supreme Court for the first time in the case attempted to analyze the objection. The record, however, had never been properly developed because the trial judge shut down further argument on the issue by stating that Woodall was white and simply "noting the objection." The Kentucky Supreme Court unreasonably applied clearly established federal law, as enshrined in *Batson, Powers, Hernandez*, and their progeny, when it excused the trial court's failure to conduct a *Batson* analysis and attempted to undertake a post hoc review of the objection with only the written transcript before it. *See Harris*, 526 F.3d at 913-14 ("[S]everal aspects of the [*Batson*] opinion convince us that the case in fact holds that *trial courts, not appellate courts,* are to assume the

28

responsibility of making factual determinations regarding a *prima facie* showing of discrimination, the prosecution's race-neutral explanation, and the ultimate existence of purposeful discrimination.") (emphasis added).

For the reasons set forth above, Woodall is entitled to the issuance of a writ on this claim. Nevertheless, the Court believes this to be a close call. The prosecutor did set forth an arguable race neutral reason for the exercise of the peremptory challenge. The problem is the trial Court never conducted further inquiry. The Kentucky Supreme Court seems to have said the reasons set forth by the prosecutor was race neutral and no reasonable jurist could find differently. However, that is an initial inquiry reserved for the trial court. Since the writ has been issued on other grounds, the Court felt this issue should likewise be reviewed. Had this been the only ground that the Court determined mandated the issuance of a writ, it would have issued it conditionally and remanded the case to the trial court to conduct the appropriate *Batson* hearing. In this case, however, the Court has determined that Woodall is entitled to the writ on a separate ground that requires the state court to vacate his death sentence. Accordingly, it would be futile as this point to direct the state court to conduct a *Batson* hearing.

C.    **EXCUSAL OF VENIREMEN HOPSON AND THOMPON FOR CAUSE**

Woodall claims that two members of the venire panel, Bessie Hopson and Richard Thompson, were improperly removed for cause by the trial court.

The relevant portion of Bessie Hopson's *voir dire* is quoted below:

THE COURT:  Ms. Hopson, if you find beyond a reasonable doubt the existence of certain aggravating factors there will be a range of penalties for you to consider . . . Would your personal beliefs prevent you or substantially impair you from considering and imposing any of these five punishments if instructed to do so by the

29

court and you found was warranted by the evidence?   Do you understand the question?

MS. HOPSON:  Yeah, I think so.

THE COURT:  Will you be able to consider each of these penalties involved in this case?

MS. HOPSON:  I think so.

THE COURT:  Would you automatically vote for any of these particular penalties?

MS. HOPSON:  Yes.

THE COURT:  You would automatically vote for one of them?

MS. HOPSON:  Yes, I would.

THE COURT:  And what penalty would that be?

MS. HOPSON:  I'd say maybe 25 years.
.
THE COURT:  Alright, You're saying that you would vote for 25 years--

MS. HOPSON:  Without parole.

THE COURT:  Pardon?

MS. HOPSON:  I think I didn't say without parole?

THE COURT:  Okay.  The one that says life without parole for 25 years.

MS. HOPSON:  Uh-huh.

THE COURT:  You think you would automatically vote for that penalty?

MS. HOPSON:  I think I would.

THE COURT: Alright.  Are you telling us that that's what you would vote for if you had to determine a sentence right now based what the charges are and what he's pled guilty to?  Is that what you're saying.

MS. HOPSON:  Yeah.

THE COURT:  If you're selected as a juror and each side presents evidence and the Court instructed you that you are to consider all these different penalties, would you be able to consider all those penalties and not automatically at the time impose the sentence of life without parole for 25 years?

MS. HOPSON:  It could be considered.

THE COURT:  Alright, but do you think you could consider the entire range of penalties based--and make your determination based upon the evidence?

MS. HOPSON:  Yes.

THE COURT:  In other words, when I say you would not automatically or would you automatically set a certain sentence, I want to know that if you heard the evidence that was presented to you by both sides in this case would you be willing to not set a sentence automatically, but consider the entire range of penalties?

MS. HOPSON:  I think it should be considered, the entire range.
 . . .

THE COURT:  Did any of this that you've read about cause you to formulate this opinion--you indicated that you had a notion it should be life without parole for 25 years I think.  That's a notion we're talking about.  Was this based upon what you read and heard about this case?

MS. HOPSON:  Yes.

THE COURT:  And would you be able to disregard anything you may have read or heard and decide this case solely on the evidence and consider this entire penalty range?  Would you be able to do that?

MS. HOPSON:  Well, if it comes up, it all depends.

THE COURT:  Depends on what?

MS. HOPSON:  The evidence.

 . . .

PROSECUTOR:  Do you have any religious beliefs or feelings against any of those range of punishments?
 . . .

MS. HOPSON:  I don't like capital punishment.

31

THE PROSECUTOR:  Pardon, me?

MS. HOPSON:  Not capital, not you know, not the chair.

THE PROSECUTOR:  I'm sorry?

MS. HOPSON:  I couldn't go for the chair.

    . . .

THE PROSECUTOR:  Are you opposed to --does your belief, your feelings inside you prevent you from really considering the death penalty?

MS. HOPSON:  No, I wouldn't consider that.

THE PROSECUTOR:  You could not consider that.

MS. HOPSON:  Uh-uh.

    . . .

THE PROSECUTOR:  The Commonwealth moves to have Ms. Hopson struck for cause.  I'd like for the record to reflect that on each occasion she was sitting in the chair she did not look at the questioner unless you asked her to.  She was looking in the opposite direction and thought she was talking to --I know when she started talking to --she was looking at Mr. Baker when you were talking to her and that  Mr. Baker was talking to her and looked the same way as well.  She's 78 years of age and she did say that she was opposed to the death penalty and could not impose it.

THE COURT:  Any response.

DEFENSE COUNSEL:  Judge, she is an elderly black woman, but she--under questioning by counsel she said that she could follow the law as you--as you instructed her to do and could consider the death penalty, and I don't see much difference in her and Ms. Pruett and a couple of others that we've---she seemed to understand all the questions also, your honor.  She did respond.  So we would motion that she stay on.

THE COURT:  This juror has problems.  I don't know what they were, but she--as Mr. Vick indicated she either didn't see--she didn't perceive where the questions were coming from.  She was looking at people that were not asking her questions. I think she's going to have problems following the evidence first.  She's 78 years old. Something wasn't right about her.  I think she's not--arguably she has a pretty good recall of what she read, but she wasn't connecting here some way or another, and I

think she would have said almost anything.  She basically answered the questions I asked the way she thought I wanted to when she said she could not consider the death penalty, she said it with conviction, and I think that she is not qualified to serve.  So I'm going to grant the motion over the objection of defense counsel.

TE 6 at 858-75.

The relevant portion of Richard Thompson's *voir dire* is quoted below:

THE COURT:  Would you automatically impose any of these penalties?

MR. THOMPSON:  No Sir.

 . . .

DEFENSE COUNSEL: The Judge talked with you briefly about the possible penalty ranges in a case of this nature.  Now I want to ask you in a case of intentional murder, rape, and kidnapping, could you consider--frankly and honestly could you consider imposing a sentence of 20 years?

MR. THOMPSON:  I don't know.

DEFENSE COUNSEL:  Well, I didn't quite hear.

MR. THOMPSON:  I'm not sure.

DEFENSE COUNSEL:  If you--now, we're talking about an intentional murder, a rape, and a kidnapping.  Could you impose or could you consider imposing the death penalty in a case like that?

MR. THOMPSON:  No sir, I don't think I could do that.

 . . .

DEFENSE COUNSEL:  And if the Judge told you as part of the law you would have to consider as one of those [possible sentences] twenty to fifty years, life, life without parole, life with no parole, and the death penalty and you had to give each and every one of those fair consideration, could you do that?

MR. THOMPSON:  I don't think I could consider the death penalty as far as something like that, no sir.

 . . .

33

THE PROSECUTOR:  Your honor, the Commonwealth would move to strike for cause upon his testimony he could not consider imposing the death penalty.

THE COURT:  Any response.

DEFENSE COUNSEL:  No response.

THE COURT:  The motion will be granted.  Have Mr. Thompson come back in.

TE 7 at 935-42.

On direct appeal, the majority of the Kentucky Supreme Court rejected this claim as follows:

After an exhaustive examination of the record in regard to the first potential juror, we conclude that the trial judge did not abuse his discretion in excusing her for cause. The potential juror was relatively articulate and knowledgeable about the different range of penalties available in the case.  She expressed a considerable interest in a penalty of life in prison for 25 years without hope of parole.  Near the end of the *voir dire* by the prosecution, she clearly stated that she did not like capital punishment and that she would not consider it period.  Although the potential juror was 78 years old, she seemed to be in full command of her faculties and knowledgeable about the legal system.

The second juror indicated a hesitancy and an ambivalence about the death penalty. When asked if he could consider the range of possible punishments, including death, he answered "No sir, I don't think I could do that." Later, when asked if he could consider death if the judge instructed the jurors to give each one fair consideration, the juror answered, "I don't think I could consider the death penalty as far as something like that, no sir." The second juror was struck for cause and the defense made no objection.  Both jurors were properly struck for cause.

*Woodall*, 63 S.W.3d at 119-20.

The Magistrate Judge concluded that this claim was procedurally defaulted with respect to the second juror, Mr. Thompson.  The Court disagrees with the Magistrate Judge that this part of the claim is barred by procedural default.  While the Kentucky Supreme Court mentioned that Woodall did not object at trial to the exclusion of Mr. Thompson, it does not appear that the Kentucky Supreme Court "actually enforced the state procedural sanction."  *Caver v. Straub*,

34

349 at 346.  The Kentucky Supreme Court analyzed the claim substantively without relying on the lack of a trial objection to support any part of its holding with respect to this part of the claim.  The Kentucky Supreme Court quoted from Mr. Thompson's *voir dire* and found that he was properly struck for cause.  As such, this Court is barred from relying on procedural default. *Id.*

The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."  U.S. CONST. amend. VI.  The right to an impartial jury is applicable to the states by way of the Fourteenth Amendment.  *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).  In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the Supreme Court held that it was improper to exclude veniremen simply because they voiced general objections to the death penalty or expressed conscientious or religious objections to its imposition.  The proper standard for determining when a prospective juror may be excluded for cause is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainright v. Witt*, 469 U.S. 412 (1985).

The Supreme Court recently characterized *Witherspoon, Wainright*, and their progeny as "establish[ing] at least four principles of relevance" to the question of a juror's death-qualification.  *Uttecht v. Brown*, – U.S.–,127 S. Ct. 2218, 2224, 167 L. Ed. 2d 1014 (2007).

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause.  Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes.  Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause;

> but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Id.* (internal citations omitted).  As the Supreme Court observed, "[d]eference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."  *Id.*

The prosecution in *Uttecht* struck for cause a juror to whom the Court referred as "Juror Z."  *Id.* at 2222.  Juror Z initially indicated that he could impose the death penalty in "severe situations."  *Id.* at 2226-27 (internal quotation marks omitted).  When asked to give examples of such situations, he said that the death penalty would be appropriate if a defendant affirmatively wanted to die or would inevitably re-offend upon release.  After being informed by defense counsel that the defendant would never, under any circumstances, be released from prison, Juror Z expressed uncertainty about his ability to impose a death sentence.  "Over the course of his questioning, he stated six times that he could consider the death penalty or follow the law, but these responses were interspersed with more equivocal statements."  *Id.* at 2227.  The prosecution challenged Juror Z for cause, citing his confusion about the proper circumstances for the imposition of a death sentence.  The defense volunteered that it had no objection, and the trial court excused Juror Z.  The Ninth Circuit granted the defendant's federal habeas petition, holding that the state courts had not found Juror Z to be substantially impaired and, further, that "the transcript unambiguously proved Juror Z was not substantially impaired."  *Id.* at 2227-28.  The Supreme Court reversed, holding that the record established that Juror Z "had both serious

36

misunderstandings about his responsibility as a juror and an attitude toward capital punishment that could have prevented him from returning a death sentence under the facts of this case." *Id.* at 2226.

Here, the *voir dire* reveals that both veniremen expressed grave and considerable objections to the death penalty.  The trial judge found that they could not properly serve as jurors because they could not fairly consider the whole range of punishments.  Based on a review of the transcript, this Court concludes the trial judge's assessment was sound.  Certainly, it was not "an unreasonable determination of the facts in light of the evidence presented."  The Kentucky Supreme Court correctly decided this claim.  Woodall is not entitled to the writ on this basis.

**D.     FAILURE TO STRIKE SIX VENIREMEN FOR CAUSE**

Woodall argues that his federal constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated because six individuals were not removed from the jury panel for cause.

Woodall used peremptory challenges to strike three of the veniremen in question:  Lana Conger [278], Joseph Sims [16], and Joe Clift [8].  The Magistrate Judge concluded that Woodall has no viable claim with respect to these veniremen because he used peremptory strikes to remove them from the panel.  *See Ross v. Oklahoma*, 487 U.S. 81, 85-86 (1988); *United States v. Martinez-Salazar*, 528 U.S. at 315-16; *Wolfe v. Brigano*, 232 F.3d 499, 501-03 (6th Cir. 2000).  The Court Adopts the Magistrate Judge's Report and Recommendation with respect to these three veniremen.  No further analysis of this part of the claim is necessary.

While the Court agrees with the Magistrate Judge's ultimate conclusion with respect to the remaining three jurors, given the magnitude of this case, the Court concludes that some

37

additional analysis is necessary to support the Court's decision to reject this part of the claim.

Woodall claims that juror Genia Morris [176] should have been stricken for cause because she indicated in *voir dire* that she worked at the Mini Mart in Greenville where the victim was abducted.  During *voir dire*, however, Ms. Morris clarified that she did not begin working at the Mini Mart until about seven months after Sarah Hansen's abduction, and that she only worked there for one month.  TE 8 at 1079.  Ms. Morris also 1) stated that she never specifically discussed the case with anyone; 2) denied knowing any of the individuals involved; 3) said that she had not formed an opinion about the case; and 4) indicated that she could consider the entire range of penalties.

The Kentucky Supreme Court rejected Woodall's claim with respect to Ms. Morris as follows:

> Juror No. 176 possessed no special knowledge that could have influenced other jurors.  The argument that the juror was situationally impaired because she had worked at the mini-market for one month more than six months after the crime occurred is without merit.  The juror specifically denied on *voir dire* that she knew one of the prosecution witnesses and there was no evidence to substantiate the claim by Woodall.  The juror indicated on *voir dire* that any conversations she may have had with fellow workers at the mini-mart were of a general nature.  There was no abuse of discretion in refusing to strike the juror for cause.

*Woodall*, 63 S.W.3d at 118-19 (internal citations omitted).

The Constitution does not require that jurors be ignorant of the facts and issues involved in a case so long as the jurors can lay aside any knowledge and render a fair verdict based on the evidence presented in court.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  An intricate knowledge of the Mini Mart's layout and parking lot might have been relevant in determining guilt or innocence.  In this case, however, Woodall admitted guilt.  Thus, the sole task of this jury was to determine the appropriate punishment for Woodall's crimes.  The Mini Mart's only

38

relevance was to set the stage.  It was irrelevant to the jury's ultimate decision.  As to that

decision, Ms. Morris indicated that she had not prejudged the case, did not know any of the

individuals involved, and could render a verdict based solely on the evidence.  Constitutionally,

Woodall was entitled to nothing more.

Woodall claims that juror Kathryn Reynolds [94] should have been stricken for cause

because she was impaired in her ability to consider the minimum penalty.  The relevant portion

of her *voir dire* is as follows:

> THE COURT:  Would you be able to consider these penalties and not automatically
> vote for any of them, but wait until you heard the evidence and consider the entire
> range before you voted on a verdict?
>
> MS. REYNOLDS:  Yes.
>
> DEFENSE COUNSEL:  . . . First of all, are you opposed or for the death penalty?
>
> MS. REYNOLDS:  I'm for it.
>
> DEFENSE COUNSEL:  For the death penalty.
>
> MS. REYNOLDS:  Depending on the circumstances.
>  . . .
>
> DEFENSE COUNSEL:  Could you consider . . . in a case where you found
> intentional murder, do you have any personal beliefs or anything that could prevent
> or substantially impair you from considering imposing a sentence of twenty years
> with possibility of parole?
>
> MS. REYNOLDS:  I couldn't go with that.
>
> DEFENSE COUNSEL:  You couldn't go with that?
>
> THE COURT:  Okay.  Let me ask you this.  If you were instructed to consider that
> and you felt it was warranted under the evidence, could you consider it?
>
> MS. REYNOLDS:  Yes, if I knew what the evidence was, yeah.
>  . . .

MS. REYNOLDS:  I don't know.  I really don't.  I can't--I think if someone has committed murder they need to pay for it.  Is twenty years long enough?  I don't know.  Can they be rehabilitated in that period of time?  I don't know.

DEFENSE COUNSEL:  That would be something important--

MS. REYNOLDS:  Yes, it would be very important.

DEFENSE COUNSEL: --for you to consider if he could be rehabilitated?

MS. REYNOLDS:  Yes.
 . . .

MS. REYNOLDS:  When a person's life is at stake, I want to hear all the information, as much as I can possibly hear.  You can't make any kind of determination without knowing everything I don't think.

TE 8 at 1115-25.

The Kentucky Supreme Court rejected this claim as follows:

Juror No. 94.  Woodall argues that the juror should have been struck for cause because she could not consider a minimum sentence.  The record shows that the juror indicated on two different occasions that she could consider the entire range of penalties.  In response to the trial judge's question of whether she could consider a twenty-year sentence if so instructed, she answered she could if it were supported by the evidence.  Although a juror is disqualified if he or she cannot consider the minimum penalty, excusal for cause is not required merely because the juror favors severe penalties, so long as he or she will consider the full range of penalties.  *Per se* disqualification is not required merely because a juror does not instantly embrace every legal concept presented during *voir dire* examination.

*Woodall*, 63 S.W.3d at 118-19 (internal citations omitted).

"A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.  Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).  This is not the case with Ms.

40

Reynolds.  She unequivocally stated that she could consider the minimum sentence if she felt it was warranted by the evidence.  She further indicated that before imposing the death sentence she would "want to hear all the information, as much as I can possibly hear."  The record supports the Kentucky Supreme Court's conclusion that Ms. Reynolds was able to fairly consider mitigating and aggravating circumstances as well as the entire range of penalties.

Finally, Woodall claims that juror Noah Miller [185] should have been stricken for cause because he allegedly did not understand the *voir dire* questions.  The relevant portion of his *voir dire* is as follows:

> DEFENSE COUNSEL:  The Judge talked with you a little about aggravation and mitigation.  Do you know what he means by mitigation?
>
> MR. MILLER:  No[t] really.
>
> DEFENSE COUNSEL:  Okay.  Well, I'm not sure I really know, but here is what I use.  I know its unclear when they just confine it to terms like that, but when we talk about mitigation--when I do, it's a fact or an event or evidence that may make you want to punish someone less severely.  Okay.  Now, self-defense, insanity, those type of things aren't mitigation.  Those are defenses.  That's not what I'm talking about.  Okay.  Am I being clear here?
>
> MR. MILLER:  Yes, I believe so.
>
> DEFENSE COUNSEL:  Mitigation would be things like a low I.Q., mental illness, whether intoxicated are a few things that are in the statute.  Would those types of things, would they be important to you in considering to reach a decision on how to punish someone or would they just not matter to a hill of beans?
>
> MR. MILLER:  Well, part of it might be.
>
> DEFENSE COUNSEL:  Which part?
>
> MR. MILLER:  On deciding on--on the stability about it.
>
> DEFENSE COUNSEL:  On the what?
>
> MR. MILLER:  The stability about it--the person.

41

> DEFENSE COUNSEL:  The stability of someone.  Okay.  That would matter to you?
>
> Mr. MILLER:  I believe so.
>
> DEFENSE COUNSEL:  You think so.  Are you sure?
>
> MR. MIlLER:  Yes.

TE 7 at 942-51.

> The Kentucky Supreme Court rejected this claim as follows:
>
> Woodall claims that Juror No. 185 should have been excused for cause pursuant to KRS 29A.080(2)(d) because he had an insufficient knowledge of the English language and was unable to understand what was being said in *voir dire*. Woodall also argues that the juror never indicated whether he could consider an I.Q. of 74 of Woodall as a mitigating factor.  No. 185 sat as a juror. He stated on two separate occasions that he could consider mitigating evidence and follow the instructions of the trial judge on mitigating evidence. During *voir dire*, the juror stated he could consider someone's stability as a mitigating circumstance. There was no abuse of discretion in denying the motion to strike for cause.

*Woodall*, 63 S.W.3d at 118-19 (internal citations omitted).

The Court has reviewed Mr. Miller's entire *voir dire*.  He appeared to understand the questions, and his answers were appropriate and responsive.  The Kentucky Supreme Court's determination with respect to Mr. Miller was not unreasonable.

In sum, the Kentucky state courts' decisions about these jurors' impartiality are not unreasonable determinations in light of the record; nor are they contrary to or an unreasonable application of established federal law.  Woodall is not entitled to relief under claim four.

**E.   UNANIMITY IN THE JURY INSTRUCTIONS**

Woodall argues that the sentencing instructions improperly led the jurors to believe that they had to unanimously find any mitigating circumstance and did not specifically instruct them otherwise.  Although no direct instruction was given requiring that the jurors find the existence

of each mitigating factor unanimously, Woodall asserts that the jurors were repeatedly instructed that their decisions had to be unanimous, but were not instructed that they did not have to be unanimous as to the existence of any particular mitigating factor.

The relevant portions of the jury instructions are as follows:

Instruction No. 1

In considering such evidence that may be unfavorable to the Defendant, you will presume the Defendant innocent of these aggravating circumstance or circumstances unless you believe from the evidence that the aggravating circumstance or circumstances exist beyond a reasonable doubt.

Instruction No. 2

In fixing the punishment for the offense of Murder, you shall consider one or both of the following aggravating circumstance or circumstances which you may believe from the evidence beyond a reasonable doubt to be true

. . .

Instruction No. 4

In fixing the sentence of the Defendant for the offense of Murder, you shall consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence and you believe to be true including but not limited to such of the following as you believe to be true . . .

Instruction No. 5

But you cannot fix the sentence at death, or at confinement in the penitentiary without benefit of probation or parole, or life in the penitentiary without benefit of probation or parole, or life in the penitentiary without the benefit or probation or parole until he has served a minimum of twenty-five years of his sentence, unless you are satisfied from the evidence beyond a reasonable doubt that one or both of the aggravating circumstance or circumstances listed in Instruction No. 2 are true in their entirety, in which event you must state in writing, signed by the Foreperson, that you find the aggravating circumstance or circumstances to be true beyond a reasonable doubt.

Instruction No. 6

If you have reasonable doubt as to the truth or existence of one or both of the aggravating circumstance or circumstances listed in Instruction No. 2, you shall not make any finding with respect to it.

If upon the whole case you have reasonable doubt whether the Defendant should be sentenced to death, you shall instead fix his punishment at a sentence of imprisonment.

Instruction No. 7

The verdict of the jury must be in writing, must be unanimous, and must be signed by one of you as Foreperson.

TR at 1136-48.

The Kentucky Supreme Court rejected this claim as follows:

Woodall claims that the trial court submitted an instruction that required the jury to find mitigating circumstances unanimously and beyond a reasonable doubt. He contends that the jury instructions, when read as a whole and given their common sense meaning, lead to a conclusion that the entire jury had to be unanimous. We find such argument unconvincing. This Court has repeatedly indicated that an instruction on unanimous findings on mitigation is not required. [] This situation does not violate the doctrine set out in *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988), because there was no requirement the jurors unanimously reach a conclusion regarding any mitigating factor. Each individual juror was free to examine and react to any mitigating factor when determining the appropriate sentence. Any juror who found a mitigating factor could use that fact to prevent the unanimous sentence of death.

*Woodall*, 63 S.W.3d at 125-26.

The Court agrees with the Magistrate Judge that the writ should not issue on this basis, but finds that additional analysis is necessary. Furthermore, given the disagreement in Sixth Circuit case law on this issue, the Court concludes that a certificate of appealability should issue with respect to this claim.

It is unconstitutional for a state to require jurors to unanimously agree on mitigators. *See*

*McKoy v. North Carolina*, 494 U.S. 433 (1990). However, the Constitution does not require a

44

state to adopt specific standards for instructing the jury in its consideration of mitigating factors under a death penalty scheme. *Zant v. Stephens*, 462 U.S. 862, 884-91 (1983).  Kentucky has chosen not to require the trial judge to instruct the jury that its findings on the existence of any particular mitigating factor does not have to be unanimous.  *Stopher v. Commonwealth*, 57 S.W.3d 787, 803 (Ky. 2001); *Tamme v. Commonwealth*, 973 S.W.2d 13, 37 (Ky. 1998).  Still, regardless of state law requirements, the Constitution forbids the instructions from being structured in such a way as to imply that mitigation must be found unanimously.  *See Abdur'Rahman v. Bell*, 226 F.3d 696, 711 (6th Cir. 2000) (citing  *Mills v. Maryland*, 486 U.S. 367 (1988)).

The standard for reviewing a claim that a sentencing instruction is ambiguous is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 379-80 (1990).  This "reasonable likelihood" standard does not require the defendant to prove that the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, he must demonstrate more than "only a possibility" of an impermissible interpretation.  *Id.*

The Sixth Circuit considered a set of instructions similar to the instructions given to Woodall's jury in *Come v. Bell*, 161 F.3d 320, 336-39 (6th Cir. 1998).  In *Come*, the Sixth Circuit held that the following jury instruction did not violate the Eighth Amendment as interpreted in *Mills v. Maryland*:  "If you unanimously determine that at least one statutory aggravating circumstance or . . . circumstances have been proved by the State, beyond a reasonable doubt, and said circumstance or circumstances are not outweighed by any mitigating

45

circumstances, the sentence shall be death." *Come v. Bell*, 161 F.3d at 336. In so holding, the Sixth Circuit rejected the petitioner's argument that the instruction improperly implied that a jury must unanimously find the existence of a mitigating factor before any juror could consider that factor. *Id.* at 338. The petitioner had argued that the instruction did so by expressly stating that the jury must make a unanimous determination as to each aggravating factor while simultaneously remaining silent as to whether a mitigating factor need be unanimously found. *See id.* at 336-38. Likewise, in *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1120-21 (6th Cir. 1990), Judge Kennedy writing for the majority of the Court on this issue explained: "The instructions carefully stated that finding an aggravating factor required such agreement, but it cannot be reasonably inferred that silence as to finding a mitigating factor would likely cause the jury to assume that unanimity was also a requirement. Indeed it would indicate the opposite." *Id.*

The instructions in Woodall's case do not differ in substance from those in *Come* and *Kordenbrock* with respect to mitigators.[3] Additionally, the Court observes that the verdict form in Woodall's case required the jury to set out in writing, signed by the foreperson, the aggravating circumstance(s) they found before imposing the death sentence. However, the jury did not have to make any written findings with respect to mitigators. This suggests that each juror could individually consider the mitigators without having to unanimously agree.

---

[3]In *Scott v. Mitchell*, 209 F.3d 854, 877 (6th Cir. Ohio 2000), the Sixth Circuit explained that its decision in *Come* on the unanimity is binding notwithstanding *dicta* in *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999), that suggests the contrary. *Id.* ("As we have explained, our *Come* decision, which well preceded *Mapes*, explicitly held that unanimity instructions like those in this case do not violate *Mills*. The *Mapes dicta* cannot preclude us from following *Come* in this case.").

Based on its review of the record and applicable case law, this Court concludes that the Kentucky Supreme Court's decision to reject this claim was not an unreasonable application of established federal law. However, given statements from the dissenting judges in *Kordenbrock* and the *dicta* in *Mapes*, the Court believes that reasonable jurists could find that the instructions impermissibly implied to the jurors that they had to unanimously agree on mitigators and that they applied them accordingly. Therefore, reasonable jurists could find the Court's analysis with respect to this claim to be debatable or wrong. Accordingly, the Court will grant a certificate of appealability with respect to this claim. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473 (2000).

## F.   ERRONEOUS VERDICT FORM

Woodall's sixth claim is that the verdict form was erroneous in that it prohibited the jury from considering the lowest two sentences because the only place on the verdict form to designate the finding of an aggregating circumstance was for a sentence of death, life without the possibility of parole, or life without the possibility of parole until he had served twenty-five years. Woodall claims this was misleading because under Kentucky law the jury could have agreed on the existence of an aggregating circumstance and still have sentenced Woodall to one of the two lesser sentences. In other words, finding the existence of aggravating circumstances permitted, but did not require, the jury to impose a heightened sentence. Again, while the Court agrees with the Magistrate Judge's ultimate conclusion that this claim does not merit issuance of the requested writ, it finds that additional analysis is necessary to support this conclusion.

The Kentucky Supreme Court rejected this claim as follows:

The verdict form used in this case and a number of other cases does not constitute reversible error. Similar arguments have been rejected in *Hodge*, *Foley*, *Haight*

47

and *Wilson v. Commonwealth*, Ky., 836 S.W.2d 872 (1992).  Federal courts have also refused to grant relief.  *See James v. Whitley*, 926 F.2d 1433 (5th Cir. 1991); *Flamer v. Delaware*, 68 F.3d 736 (3rd Cir. 1995).

*Woodall*, 63 S.W.3d at 133-34.

The verdict form must be considered in conjunction with the written instructions. *Slaughter v. Parker*, 450 F.3d 224, 241 (6th Cir. Ky. 2006) (citing *Cupp v. Naughten*, 414 U.S. 141, (1973)).  The body of the instructions accurately apprised the jurors that even if they found the existence of an aggravating circumstance they were not required to impose one of the three enhanced sentences.  The jury was instructed that it could fix Woodall's sentence anywhere from a minimum of twenty years in prison to a maximum of death.  *See* TR at 1141.  They were not instructed that the finding of one of the aggravating circumstances mandated that they choose one of the most severe punishments.  When the verdict form is viewed in conjunction with the instructions, it is clear that Woodall's jury was instructed to consider the entire range of penalties irrespective of their decision on the existence of an aggregating circumstance.  The Kentucky Supreme Court did not erroneously apply the law in this regard.

In the alternative, the Court concludes that any error was harmless because the jury chose the most severe of the three penalties.  "A constitutional error is harmless when 'it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"  *Mitchell v. Esparza*, 540 U.S. at 17 (quoting *Neder v. United States*, 527 U.S. 1, 19 (1999)).  Here, even if the jury thought that upon finding an aggregating circumstance it had to impose one of the three harshest penalties, the fact that it picked death, the harshest, implies that it would not have imposed one of the two more lenient alternatives even if it had believed them to be available.  Had the jury imposed the least severe of the three, life without the possibility of

48

parole until Woodall had served twenty-five years, the harmless error might be different because it could be argued that the jury might have gone with one of the two lesser sentences had it believed them available.  Such an argument, however, cannot be made in this instance.

The Kentucky Supreme Court's decision to reject this claim was not an unreasonable application of federal law.

## G.    PROSECUTORIAL MISCONDUCT

Woodall's seventh claim is that the prosecutor's numerous allegedly improper and prejudicial comments during closing arguments denied Woodall a fair trial.  Woodall specifically complains that the prosecutor improperly:  1) argued that Woodall's guilty plea was simply part of his defense "strategy"; 2) commented on Woodall's silence; 3) appealed to the jurors' sense of responsibility to the community; 4) extolled the goodness of the victim and included victim impact arguments regarding the loss suffered by her family; 5) sensationalized the night of the crimes and labeled Woodall as "evil"; 6) went outside of the record to quote a book by John Walsh about the evil of killers; and 7) misstated the law on mitigation.

The Magistrate Judge concluded that Woodall procedurally defaulted these claims.  This Court disagrees.  The Kentucky Supreme Court merely "noted" that Woodall's counsel did not object to these portions of the closing.  A close reading of the Kentucky Supreme Court's opinion reveals that while the failure to object was mentioned by the court, it did not actually rely on procedural default to support its decision.  Instead, the Kentucky Supreme Court based its holding entirely on the merits.  Because procedural default was only noted, and not relied on,

by the Kentucky Supreme Court, this Court must substantively review the claims.[4]  *Caver v. Straub*, 349 F.3d at 346.

"To be cognizable" on habeas review, prosecutorial misconduct "must have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  In this respect, "'the touchstone of the due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'"  *Serra v. Mich. Dep't of Corr.,* 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  If the court determines that a statement or action is improper, it must then weigh the following factors:  "(1) whether the conduct or remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the conduct or remarks were deliberately or accidentally made; and (4) whether other evidence against the defendant was strong."  *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).  "Claims of prosecutorial misconduct are reviewed deferentially on habeas review."  *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

### 1.    Guilty plea being a defense strategy

During his closing argument the prosecutor made the following statement about Woodall's decision to plead guilty:

> [Y]ou've heard on and on how the defendant has pled guilty.  Well ladies and gentlemen, don't think that I asked him to plead guilty.  Don't think that I care if he pled guilty or not.  So why did he plead guilty?  We've got somebody here through attorneys, through counsel, who has received a copy of each and every report that we

---

[4]In doing so, the Court has throughly reviewed the prosecutor's entire closing argument. TE 12 at 1601-23.

had.  It's called an open file.  They got what we got.  They got copies of all the
evidence, all the reports, the DNA, the fingerprints.  They got everything.  Now, you
heard the testimony -- when did this happen?  Was this on January the 27th of 1997?
Of course not.  The defendant stood in this Court on April 10 of 1998 and pled guilty
so that defense counsel can say . . . "Keith has pled guilty.  He's admitted he's done
wrong, so we're not here for that."

TE 12 at 1611-12.

It is permissible for a prosecutor to comment on defense strategy.  *Slagle v. Bagley*, 457

F.3d 501, 522 (6th Cir. 2006).  "Case law permits comments that are made in response 'to the

argument and strategy of defense counsel.'"  *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000)

(quoting *Butler v. Rose*, 686 F.2d 1163, 1172 (6th Cir. 1982)).  In *Byrd*, during the sentencing

phase the petitioner made an unsworn statement to the jury in which he expressed some remorse,

but did not actually admit the murder for which he had been convicted.  In closing, the

prosecutor called the statement "shallow" and implied that the defendant made it only to save

himself from death.  The Sixth Circuit held that the prosecutor's comments on this strategy were

proper.  *Id.  See also United States v. Pedron*, No. 07-11269, 2008 U.S. App. LEXIS 11696

(11th Cir. Fla. May 30, 2008) (holding prosecutor's comment that defense was akin to a "grade

school playground tactic" was a "valid remark on defense strategy," and did not amount to

prosecutorial misconduct).  The Supreme Court of Kentucky correctly applied federal law in

rejecting this claim.

### 2.    Commenting on Woodall's silence

Woodall argues that certain comments the prosecutor made about his demeanor during

trial were an unconstitutional attack on his Fifth Amendment right to remain silent.  The

prosecutor made the following observation during his closing:

You've heard everyone talk of their observations of the defendant.  How many of

> those have told you that he's got a habit of sitting around looking down like this for
> a week at a time?  Don't be fooled.  Don't be fooled by that.  That's not the
> defendant, Robert Keith Woodall.

TE 12 at 1612.

It is well established that a prosecutor's direct reference to a criminal defendant's failure

to testify is a violation of the Fifth Amendment privilege against compelled self-incrimination.

*Griffin v. California*, 380 U.S. at 609.  Indirect references on the failure to testify also can violate

the Fifth Amendment.  *Byrd v. Collins*, 209 F.3d at 533.  "When the alleged infringements

consist of such references, 'a reviewing court must look at all the surrounding circumstances in

determining whether or not there has been a constitutional violation.'"  *Id.* (quoting *Butler v.

Rose*, 686 F.2d 1163, 1170 (6th Cir. 1982)).  The court must undertake a "probing analysis of the

context of the comment."  *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir. 1981).  This

"probing analysis" entails the consideration of four factors:

> (1) Were the comments "manifestly intended" to reflect the accused's silence or of
> such a character that the jury would "naturally and necessarily" take them as such;
> (2) Were the remarks isolated or extensive;
> (3) Was the evidence of guilt otherwise overwhelming; [and]
> (4) What curative instructions were given, and when.

*United States v. Moore*, 917 F.2d 215, 225 (6th Cir. 1990) (quoting *Spalla v. Foltz*, 788 F.2d

400, 404-05 (6th Cir. 1986)).

The Kentucky Supreme Court reached the following conclusion about the prosecutor's

statements:  "The prosecutor was entitled to make a comment on the demeanor of Woodall in the

courtroom.  There was no objection to this comment and no prejudice resulted.  It did not refer to

a lack of remorse or silence or failure to testify."  *Woodall*, 63 S.W.3d at 125.  This conclusion is

not an unreasonable application of established federal law.  This Court agrees that the statements

concerning Woodall were not manifestly intended to reflect on his failure to testify at trial, nor would the jury have understood the statements as such. *See e.g., Cunningham v. Perini,* 655 F.2d 98, 100 (6th Cir. 1981) (holding that comment that defendant just sat and stared during trial did not run afoul of the Fifth Amendment); *Bates v. Lee*, 308 F.3d 411, 421 (4th Cir. 2002) ("This court has found that prosecutorial comments about the lack of remorse demonstrated by a defendant's demeanor during trial do not violate a defendant's Fifth Amendment right not to testify.").

### 3.    Appealing to jury's sense of community

During the closing argument the prosecutor appealed the jury's sense of community:

> Your verdict--simple word isn't it, your verdict, but your verdict, ladies and gentlemen, is more than just your verdict.  You are the representatives of Caldwell County.   You are the representatives of Muhlenberg County.   You are the representatives of each citizen of this State.  Criminal law is a lot like, I feel, a contract or an agreement between our various citizens, because we have a large number of people when a criminal trial occurs chosen representatives, jurors are picked, are selected, to hear evidence and return a verdict, and all of us who you represent rely upon you to do your job, to return in every case and in this case a true verdict.

TE 12 at 1602.  Woodall claims that the prosecutor improperly argued that the jury should impose the death penalty in order to fulfill its societal duty.  The Kentucky Supreme Court rejected this argument:  "The prosecutor did not improperly appeal to the jury's sense of responsibility to the community.  A prosecutor may call on a jury to do its duty.  *Woodall*, 63 S.W.3d at 124 (citing *Slaughter v. Commonwealth,* 744 S.W.2d 407 (Ky. 1988)).

The Kentucky Supreme Court's rejection of this claim was not a unreasonable application of federal law.  The Sixth Circuit has noted that "unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are

not *per se* impermissible." *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991).  In

*Solivan*, the prosecutor urged the jury to convict the defendant of drug charges in order to send a

message to all drug dealers that they were not welcome in the community.  On direct appeal,

under its supervisory powers, the Sixth Circuit held that the argument constituted reversible

error.  Woodall's case must be examined under the more stringent habeas review standards.

Additionally, the argument complained of does not ask the jury to send a message to other

potential murderers or rapists.  Woodall's prosecutor asked the jury to impose a verdict of death

as the appropriate punishment for the crimes Woodall committed.  In so doing, the prosecutor

urged the jury to weigh all the aggravating circumstances against the mitigating factors.  In *Byrd*

*v. Collins*, 209 F.3d at 539, the Sixth Circuit held that such arguments do not constitute a

violation of due process on habeas review.  *Id.*

### 4.  Victim impact evidence

In his closing, the prosecutor spoke of the victim as "pure goodness" and briefly

discussed the impact the crime had on her family.  Woodall argues that statements such as these

deprived him of a fair trial.  The Kentucky Supreme Court rejected Woodall's argument.

> The Commonwealth may portray the reality of the violence, giving some background
> and information regarding the victim in order to give a full understanding of the
> nature of the crime.  In a concurring opinion, it has been stated that a prosecutor can
> provide the fact finder with a quick glimpse of the life the criminal chose to end so
> as to remind the jury that the victim was a unique human being.  *Payne v. Tennessee,*
> 501 U.S. 808 (1991). We agree.  We have found no error in bringing to the attention
> of the jury that the victim was a living person, more than just a nameless void left
> somewhere on the face of the community.  *McQueen v. Commonwealth, Ky.*, 669
> S.W.2d 519 (1984).  The references to the victim and her family did not in any way
> deprive Woodall of a fair and impartial trial. Victim impact evidence is another
> method of informing the sentencing authority about the specific harm caused by the
> crime.  *Payne, supra*

*Woodall*, 63 S.W.3d at 124.

The Kentucky Supreme Court correctly applied federal law.  In *Payne v. Tennessee*, 501

U.S. 808 (1991), the Supreme Court held as follows:

> We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar.  A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*Id.* at 827.   Kentucky law permits reference to victim impact evidence.  *See  McQueen v.*

*Commonwealth*, 669 S.W.2d 519, 523 (Ky. 1984) ("[W]e find no error in bringing to the

attention of the jury that the victim was a living person, more than just a nameless void left

somewhere on the face of the community.").  There was no constitutional violation.

**5.**     **Describing the night as horror and terror filled and calling Woodall "evil"**

In *Darden v. Wainright*, 477 U.S. 168, 180-82 (1996), the United States Supreme Court

considered comments far more sensational than the remarks currently at issue.  The prosecutor in

*Darden* called the defendant an "animal," stated that the death penalty was the only way to

adequately protect the public, and intimated that society would have been better off if the

defendant had just killed himself.  *Id.*  In evaluating whether the remarks entitled the defendant

to habeas relief the Court first observed that "the appropriate standard of review for such a claim

on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of

supervisory power.'"  *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. at 642).  The Court then

concluded that the remarks while improper, did not deprive the defendant of a fundamentally fair

trial.

Under Kentucky law, it is proper for counsel to make reasonable inferences from the

evidence during closing arguments.  *See Richards v. Commonwealth*, 517 S.W.2d 237, 242 (Ky.

1974).  From the evidence presented at trial, it is clear that for the victim the night was a terrible

horror filled ordeal that culminated in her death.  She was kidnapped by a stranger, her head was

nearly severed, she was brutally raped, drug naked in the dark across the freezing ground, and

tossed in an icy lake where she drowned.  The night was horrific and the victim no doubt was

filled with terror as these terrible events unfolded.  The evidence would have supported even a

far more graphic closing than the one delivered by the prosecutor.  The prosecutor did not

engage in any misconduct in his description of the events and crime.

The Court now turns to the prosecutor's description of Woodall as evil.  The acts

Woodall committed were evil.  There is no question about that.  However, a prosecutor should

refrain from "gratuitous insults" of the defendant.  *See Byrd v. Collins*, 209 F.3d at 536.

Although improper, the prosecutor's use of the term "evil" did not deprive Woodall of a

fundamentally fair trial.  As a whole the closing was above board, the evidence in favor of the

death penalty was strong, and there is nothing to suggest that the jury was mislead by the

statement.  As such, Woodall is not entitled to habeas relief on this claim.  *United States v.*

*Carter*, 236 F.3d at 783.

### 6.    Discussing Book in Closing

During his closing, the prosecutor discussed a book by John Walsh.  The book described

the belief that there is such a thing as pure evil.  Its unclear to this Court exactly what the

prosecutor was attempting to accomplish in discussing the book.  The most logical explanation,

however, is that he was attempting to group Woodall among those described in book as

concerned only with fulfilling their desires no matter the impact on the rest of society.  After

reviewing the portion of the closing at issue, the Court concludes that the prosecutor's comments

were within the permissible range of rhetoric employed in closing argument and did not affect

the fairness of the trial.  They did not lead to a miscarriage of justice authorizing habeas relief.

The jury could have inferred from the evidence alone that on the night in question Woodall was

concerned only with self-gratification and displayed no concern for the fear he instilled in his

victim or the pain he inflicted on her before her death.

**7.      Misstated law on mitigation**

Woodall claims that he was denied a fundamentally fair trial because the prosecutor

misstated the law as it pertains to mitigation.  During his closing, the prosecutor made the

following argument concerning mitigation:

> Mitigating circumstances-- let's talk about that a minute.  The Court has told you,
> and it's in there, that the mitigating circumstances are two.  Let me take the second
> one first.  For you to consider the youth of the defendant at the time of the crime
> . . . The only other mitigator for you to consider here is if at the time of the offense
> committed by the defendant he didn't have the capacity, the ability to appreciate the
> criminality of the requirements of law and was impaired as a result of mental illness
> or retardation.

TE 12 at 1615.

> The jury instructions regarding mitigation stated:

> In fixing the sentence of a defendant for the offense of murder, you shall consider
> such mitigating or extenuating facts and circumstances as have been presented to you
> in the evidence and you believe to be true including but not limited to such of the
> following you believe from the evidence to be true:

> 1.  At the time of the offenses committed by the Defendant, the capacity of
> the Defendant to appreciate the criminality of his conduct or to conform the conduct
> to the requirements of the law was impaired as a result of mental illness or
> retardation, even though the impairment of the capacity of the Defendant to
> appreciate the criminality of his conduct or to conform the conduct to the
> requirements of the law is insufficient to constitute a defense to the crime.

> 2.  The youth of the defendant at the time of the crime.

57

TR at 1140.

It is improper for the prosecutor to misstate the law to the jury. *See United States v. Berry*, 627 F.2d 193, 200 (9th Cir. 1980); *United States v. Hammond*, 642 F.2d 248, 249-50 (8th Cir. 1981).   To obtain relief, however, a petitioner must show that:  1) the prosecutor in fact misstated the law; and 2) the misstatement rendered the trial fundamentally unfair.  *Dobbs v. Kemp*, 790 F.2d 1499, 1504 (11th Cir. 1986), *modified in other part*, 809 F.2d 750 (11th Cir.), *cert. den.*, 481 U.S. 1059 (1987) (holding that prosecutor's misstatement of law did not render trial fundamentally unfair given the obscurity of the improper implication, the clear instructions by the trial judge, and the overwhelming evidence of guilt).  A misstatement is harmless if the court properly instructs the jury on that point of law or instructs that the attorneys' statements and arguments are not evidence.  *Bland v. Sirmons*, 459 F.3d 999, 1016 (10th Cir. 2006).

In this case, Woodall claims that the prosecutor's remarks were improper because "he totally omitted the second half of the instructions . . . requiring the jury to consider Petitioner's mental illness and retardation even if resulting impairment of his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was insufficient to constitute a defense of the crime."  Pet. at 40.  At most, the prosecutor can be faulted for selectively quoting the jury instructions.  His did not, however, affirmatively misstate the law.  Even if he had, any error would be harmless because the jury was properly instructed by the trial court on the law of mitigation.  There is no evidence in the record that the jury did not follow the written instructions.  And, the jury is presumed to follow its instructions, *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000), even when there has been misleading argument.  *See Boyde v. California*, 494 at 384 (explaining that "arguments of counsel generally

carry less weight with a jury than do instructions from the court").

In conclusion, the Court cannot say that the Kentucky Supreme Court's decision to reject Woodall's prosecutorial misconduct claims was contrary to, or involved an unreasonable application of, clearly established federal law, as reflected in the decisions of the United States Supreme Court.

## H.     RESTRICTIONS ON VOIR DIRE

Woodall's eighth claim of error is that the trial court impermissibly curtailed his ability to ask relevant *voir dire* questions.  Specifically, Woodall claims that he should have been allowed to ask potential jurors about 1) whether they would consider evidence of his borderline mental retardation; 2) their feelings concerning Woodall's right to remain silent; 3) the fact that the jury did not have to be unanimous on mitigating factors; and 4) the fact that mitigating circumstances did not have to be proven beyond a reasonable doubt.  The Kentucky Supreme Court held that the trial court conducted an adequate *voir dire* examination that allowed the seating of a fair and impartial jury.  *Woodall*, 63 S.W.3d at 116.

The Court agrees with the Magistrate Judge's ultimate conclusion that this claim does not warrant issuance of the requested writ.  Upon review, however, the Court concludes that additional analysis is needed to support this conclusion.

"The Supreme Court has consistently 'stressed the wide discretion granted to the trial court in conducting *voir dire* . . . in . . . areas of inquiry that might tend to show juror bias." *Beuke v. Houk*, 537 F.3d 618, 637 (6th Cir. 2008) (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991)).  "In the context of *voir dire*, the trial court violates the defendant's constitutional rights only when  it restricts a "constitutionally compelled" question.  *Id.*  "To be

constitutionally compelled . . . it is not enough that such [*voir dire*] questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Mu'Min v. Virginia*, 500 U.S. at 425-26.  The Constitution does not dictate a particular *voir dire* process; it demands only that the process be "adequate . . . to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. at 729 ("The Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury.").  To be adequate, *voir dire* need not establish juror partiality with "unmistakable clarity." *Wainwright v. Witt*, 469 U.S. at 424 (internal quotation marks omitted).  It must only be sufficient to permit a trial judge to form "a definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* at 426.

In his objections, Woodall complains that the Magistrate Judge did not "consider, distinguish or address" a Sixth Circuit case, *United States v. Blount*, 479 F.2d 650 (6th Cir. 1973), and its progeny.  In *Blount*, a Sixth Circuit panel held that it was reversible error for the district court to refuse to ask prospective jurors during *voir dire* if "they could accept the proposition of law that a defendant is presumed innocent, has no burden to establish his innocence, and is clothed throughout the trial with this presumption." *Id.* at 651.  "The Sixth Circuit has refused, however, to extend the holding of *Blount* to any other areas of inquiry and later held, in *United States v. Aloi*, 9 F.3d 438 (6th Cir. 1993), that the district court's refusal to question prospective jurors concerning a defendant's right not to testify was not a reversible abuse of discretion." *United States v. Hernandez*, 232 F. App'x 561, 565 (6th Cir. 2007).

This Court has reviewed the entire *voir dire*.  After doing so, it has concluded that defense counsel were given enough latitude in questioning to seat an impartial jury.  While Woodall might

have desired more specific inquiry into areas such as his mental infirmity, the trial court allowed

enough questioning for Woodall's counsel to select an impartial jury.  Even in this area, Woodall

was not completely shut down.  His counsel were allowed to ask the potential jurors if they "could

consider the mental condition of the defendant at the time of the offense."  TE 5 at 670.

The Kentucky Supreme Court's resolution of this claim was not contrary to or an

unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States; nor did it result from an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding.

## I.      USE OF STATEMENTS IN SEX OFFENDER EVALUATION

Woodall's ninth claim is that the trial court's use of statements Woodall made during a

sex offender evaluation was unconstitutional.  The Court adopts the Magistrate Judge's Report

and Recommendation with respect to this claim.  No further analysis is necessary.

## J.      VOLUNTARINESS OF WOODALL'S GUILTY PLEA

Woodall's tenth claim for relief is that his guilty plea was not knowing and voluntary.

The relevant portions of Woodall's guilty plea are as follows:

> THE COURT:  Mr. Woodall on the 18th day of March of 1997 the Muhlenberg
> County Grand Jury returned an indictment against you charging you with three
> counts of felonies. One committed is the capital offense of murder, two charging you
> with the capital offense of kidnapping, also thirdly, a first degree rape was the third
> count.   You subsequent to that entered a not guilty plea to that--those charges.
> However, today the Court has been handed a motion to enter a guilty plea, and I
> understand it is a conditional plea, and I'll ask you--it looks like it's been signed by
> you.  I'll ask you is that your signature.

> DEFENDANT:  Yes sir.

> THE COURT:   Okay.   Mr. Williams [defense counsel], I understand that the
> defendant is wishing to enter a conditional plea.  Is that correct?

MR. WILLIAMS:  That's correct Judge.

. . .

THE COURT:  Okay.  Would you raise your right hand please?  Do you swear or affirm the testimony you are about to give is the truth, the whole truth, and nothing but the truth, so help you God?

THE DEFENDANT:  Yes sir.

THE COURT:  State your name for the record, please.

THE DEFENDANT:  Robert Keith Woodall.

THE COURT:  And Mr. Woodall, what's your date of birth?

THE DEFENDANT:  3-19-74.

THE COURT:  And subject to the--excuse me.  Let me ask you this.  How much education do you have?

THE DEFENDANT:  I finished the 11th grade.

THE COURT:  You can lower your hand.  Subject to the pretrial motions you filed in this case, have you ever suffered from a mental disease or defect or do you now suffer from a mental disease or defect.

THE DEFENDANT:  Not that I know of.

THE COURT:  And have you talked with Mr. Williams about this guilty plea?

THE DEFENDANT:  Yes Sir.

THE COURT:  Have you had all the time you need to talk to him about it?

THE DEFENDANT:  Yes Sir.

THE COURT:  Do you have any complaints about the legal advice given to you by Mr. Williams and Mr. Baker?

THE DEFENDANT:  No Sir.

THE COURT:  Are you fully satisfied with the job they've done for you?

THE DEFENDANT:  Yes Sir.

THE COURT:  Did you read and understand this motion to enter a guilty plea before you signed it?

THE DEFENDANT:  Yes Sir.

THE COURT:  And did you sign it voluntarily of your own free will and accord?

THE DEFENDANT:  Yes sir.

THE COURT:  Do you understand, Mr. Woodall, what facts the Commonwealth would have to prove beyond a reasonable doubt to be convicted of these offenses?

THE DEFENDANT:  Yes sir.

THE COURT:  And did you on or about January 25th, 1997, in Muhlenberg County commit the capital offense of murder by cutting Sarah Hansen with a sharp object and drowning her, and this murder was committed while engaged in the offense of rape in the first degree?

THE DEFENDANT:  Yes sir.

THE COURT:   And did you on January 25th, 1997, in Muhlenberg County, Kentucky, commit the capital offense of kidnapping Sarah Hansen in which she was not released alive?

THE DEFENDANT:  Yes sir.

THE COURT:   And did you on January 25th, 1997, in Muhlenberg County, Kentucky, commit the offense of first degree rape by engaging in sexual intercourse with Sarah Hansen through the use of forcible compulsion in which she received serious physical injury and death?

THE DEFENDANT:  Yes sir.

THE COURT:  Do you understand, Mr. Woodall, you have the following rights? You have the right to a trial by jury in which the Commonwealth has to prove these facts beyond a reasonable doubt.  Do you understand that?

THE DEFENDANT: Yes sir.

THE COURT:  Do you understand you have the right during that trial to cross examine and confront witnesses that might be called to testify against you?

THE DEFENDANT:  Yes sir.

THE COURT: You have a right to compel the attendance of witnesses you might want to be brought in to testify in your behalf.  Do you understand that?

THE DEFENDANT:  Yes sir.

THE COURT:  You have a right to have a lawyer appointed for you not only at the trial, as you have had in this case, but also on appeal if you're convicted.  Do you understand you have that right?

THE DEFENDANT:  Yes sir.

THE COURT:  More importantly, do you understand you have a right against self-incrimination, which means that you don't have to say anything and that the Commonwealth would have to prove you guilty beyond a reasonable doubt?

THE DEFENDANT:  Yes sir.

THE COURT:  Do yo understand you have that right?

THE DEFENDANT:  Yes sir.

THE COURT:  Do you understand you waive or give up all those rights by pleading guilty?

THE DEFENDANT:  Yes sir.

THE COURT:  And do you understand furthermore in this case, Mr. Woodall, what the penalty range is that could be imposed upon you for these offenses?

THE DEFENDANT:  Yes sir.

THE COURT:  Do you understand that based upon your plea that your sentence could be set upon this case upon this indictment on two of the offenses at least a penalty for from twenty years to life, the other option would be life without the benefit of parole for 25 years or straight life, and fourthly, the death penalty could be imposed based upon your guilty plea.  Do you understand that?

THE DEFENDANT:  Yes sir.

THE COURT:  And you've discussed this with your attorney and understand these-- this range and the fact that the death penalty is an option in this case. Do you understand that?

THE DEFENDANT:  Yes sir.

THE COURT:  And you've discussed that with your attorney?

THE DEFENDANT:  Yes sir.
 . . .

THE COURT:  Okay, Mr. Woodall, based upon these rights that I've given to you, is it still your desire to waive these rights . . . and go ahead and enter this plea to these offenses knowing what the full range of penalties are and which includes a maximum penalty of death . . . and enter your plea to this--these charges this afternoon?

THE DEFENDANT:  Yes sir.

THE COURT:  And do you plead guilty freely, voluntarily, of your own free will and accord?

THE DEFENDANT:  Yes sir.

THE COURT:  Has anybody for the Commonwealth or otherwise made you any offers of reward or anything to cause you to want to plead guilty?

THE DEFENDANT:  No sir.

THE COURT:  Anybody done anything to try to coerce or force you to plead guilty?

THE DEFENDANT:  No sir.

THE COURT:  Do you plead guilty voluntarily, intelligently, of your own free will and accord?

THE DEFENDANT:  Yes sir.

THE COURT:  Knowing these rights that the Court has given to you, is it still your desire to waive or give up those rights and go ahead and enter this plea of guilty to count--one count of murder while in the commission of rape in the first degree, a capital offense kidnapping when the victim was not released alive and for rape in the first degree, and want to go ahead and enter a plea to those three counts?

THE DEFENDANT:  Yes sir.

THE COURT:  Mr. Williams, have you discussed this case, and I'm sure you have, fully with Mr. Woodall?

Mr. WILLIAMS:  Yes, Judge, I have to the extent that I've been able to.

THE COURT:  Do you feel like he understands his rights and the nature of these proceedings?

MR. WILLIAMS:  He understands his rights and the nature of these proceedings.

THE COURT:  Is his plea consistent with your advice and based on your consultations with him, do you believe it's made voluntarily, intelligently, of his own free will?

Mr. WILLIAMS:  Yes, Judge, I believe so.

TE 3 at 405-21.

The Kentucky Supreme Court disposed of this claim as follows:

Woodall claims that his guilty plea was invalid because it was not a knowing, voluntary and intelligent waiver of his constitutional rights.  He states that the plea was not entered voluntarily because of his low intelligence and the impairment of counsel and that he did not understand that he would be waiving his Fifth Amendment privilege by pleading guilty and finally that the trial judge did not adequately establish the factual basis for the plea.  He concedes that this issue is unpreserved.

Woodall specifically answered the questions of the court regarding the voluntariness of the plea in the affirmative on three different occasions.  It is clear that Woodall understood all the consequences of his plea. Counsel made it clear that he had discussed the case with the defendant and he stated that he believed the plea to be voluntary. As stated in *Kotas v. Commonwealth*, Ky., 565 S.W.2d 445 (1978), citing *Brady v. United States*, 397 U.S. 742 (1970), the validity of a guilty plea is determined not by reference to some magic words but from the totality of the circumstances surrounding it.  Here, there was the necessary affirmative showing in the record that the plea was intelligently and voluntarily made as required by *Boykin v. Alabama*, 395 U.S. 238 (1969), and noted in *Sparks v. Commonwealth*, 721 S.W.2d 726 (1986).

There is no convincing evidence that defense counsel was impaired when he advised Woodall to plead guilty.  There is a letter from counsel's physician stating that the lawyer was physically and emotionally exhausted but that was almost two months before the plea was entered. There was no indication that counsel was impaired during the plea colloquy, nor was health ever raised as an issue during the proceedings. The plea was properly accepted by the trial judge.

66

> The claim by Woodall that he was not informed of the effect of the guilty plea is
> without merit. The defendant was fully informed of his rights by the trial judge.
> There is nothing in the record to indicate that he did not have a full and complete
> understanding of his rights and that he voluntarily chose to plead guilty. The record
> indicates that the trial judge carefully explained the factual basis for each charge
> against Woodall who then admitted his guilt as to all charges. The procedure
> followed the requirements of *Henderson v. Morgan*, 426 U.S. 637 (1976).

*Woodall*, 62 S.W. 3d. at 131-32.

The Magistrate Judge concluded that this Court was barred from reviewing this claim

because it was procedurally defaulted. A federal habeas court is precluded from reviewing a

state court judgment only if it determines that the "judgment rests on a state-law ground that is

both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's

decision." *Harris v. Reed*, 489 U.S. 255, 260 (1989). While the Kentucky Supreme Court noted

that this claim was "unpreserved," a through reading of the state court opinion indicates that

procedural default was not "actually enforced" by the state court, and therefore, did serve as "an

adequate and independent state ground on which the state can rely to foreclose review of a

federal constitutional claim." *Maupin v. Smith*, 785 F.2d at 138. Thus, because the state court

merely mentioned, but did not actually rest, its decision on procedural default, the Magistrate

Judge's reliance on procedural default is improper in this instance. *See, e.g., Bowling v. Parker*,

344 F.3d 487, 498 (6th Cir. 2003) (holding that procedural default did not preclude review of

claim on habeas because "the Kentucky Supreme Court in its opinion reveals that it did not

clearly rely on Bowling's procedural default to dismiss the claims raised in his supplemental

motion."). Therefore, this Court must evaluate the substance of the Kentucky Supreme Court's

rejection of this claim under the AEDPA standards.

"While the court taking a defendant's plea is responsible for ensuring 'a record adequate

for any review that may be later sought,' *Boykin v. Alabama*, 395 U.S. 238, 244 (1969), we have never held that the judge must himself explain the elements of each charge to the defendant on the record.  Rather, the constitutional prerequisites of a valid plea may be satisfied where the record accurately reflects that the nature of the charge and the elements of the crime were explained to the defendant by his own, competent counsel." *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005).  In this case, the record indicates that Woodall was aware of the nature of the offenses to which he pled guilty and the consequences of his decision to do so.  Furthermore, based on the record, it is entirely reasonable to conclude that the Woodall's plea was voluntary.

Additionally, the Court observes that given the magnitude of evidence against Woodall and the brutality of the crime, counsel's recommendation that Woodall plead guilty was a sound one.  The Court ordered Woodall to be evaluated by an independent expert, Dr. Richard Johnson.  Based on Dr. Johnson's evaluation of Woodall, there did not appear to be any defenses available that would have more likely than not led to a not guilty verdict.  Counsel made a reasoned and sound judgment to recommend that Woodall plead guilty and hope that the jury would show mercy in its sentencing.

The Kentucky Supreme Court's resolution of this claim was not contrary to or an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; nor did it result from an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

## J.      TRIAL COURT'S REFUSAL TO GRANT WOODALL'S THIRD REQUEST FOR A CONTINUANCE

Woodall's eleventh claim is that the trial judge's refusal to grant a third continuance in June 1998 infringed on Woodall's Sixth Amendment right to a fair trial.  The Court adopts the

Magistrate Judge's Report and Recommendation with respect to this claim.  The Court also observes that "when a continuance is denied, the defendant must demonstrate actual prejudice resulting from the denial.  He must demonstrate that a continuance would have made relevant witnesses available or added something significant to the defense."  *United States v. Conteh*, 234 F. App'x 374, 385 (6th Cir. 2007).  Woodall has failed in this respect.  Any additional witnesses or testimony counsel would have been able to present with more time would have merely been cumulative to mitigation evidence presented by Woodall.

## K.   TRIAL COURT'S DENIAL OF FUNDING TO CONDUCT ADDITIONAL TESTING

Woodall's twelfth claim is that the trial judge abused his discretion by denying Woodall's motion for funding to conduct a positron emissions tomography (PET) scan and other psychological testing.  The Court adopts the Magistrate Judge's Report and Recommendation with respect to this claim.  The Court also points out that it has reviewed the entire transcript from the state court hearing on this issue.  TE 3 at 303-425.  Based on the testimony presented, the trial court made a reasonable determination that additional psychological testimony was not reasonably necessary.  This is not a case where Woodall was denied all testing.  Independent testing was conducted by Dr. Johnson at state expense.[5]  That testing revealed that there was

---

[5]This testing was quite extensive.  As explained by Dr. Johnson,

Mr. Woodall was admitted to KCPC on February the 3rd 1998, and he was discharged on February the 17th, 1998.  So he was at our facility for roughly two weeks.  That process of evaluation involves not only myself, but all of the professional staff as well as the support staff.  In other words, when a person is admitted, they will have an admitting physical examination by a psychiatrist who is also certified as a neurologist.  The psychiatric social worker will collect the background and the personal history information.  The attending physician, one of the psychiatrists, will provide any kind of medical care, any kind of medication, if indicated, as well as offering an assessment of how the person is functioning, and

nothing present to suggest Woodall suffered from an organic brain impairment.  While an indigent criminal defendant may be entitled to expert assistance, he is not entitled to funding to "expert shop" until he finds an expert willing to give him a diagnosis favorable to his defense. *See Lundgren v. Mitchell*, 440 F.3d 754, 773 n.6 (6th Cir. 2006) ("Even in capital cases, a defendant is entitled to only one qualified mental health expert at the expense of the state, even if the conclusions of that expert fail to favor the defense.") (citing *Ake v. Oklahoma*, 470 U.S. 68, 72 (1985)).

## L.   WOODALL'S ALLEGED INCOMPETENCY

Woodall claims that he was incompetent "to assist counsel in fashioning an appropriate mental health defense."  Woodall also argues that he was "forced to proceed in a collateral proceeding when he was incompetent."

The Kentucky Supreme Court resolved this claim as follows:

---

then the psychologist will perform a battery of psychological tests.  I perform and conduct my own psychological testing.  Also, the person is being observed 24 hours a day by nurses and by correctional staff, so over a period of two weeks Mr. Woodall was seen by a number of individuals.  I have access to all of the notes that they would enter into the file and would incorporate all of that information into the final report which was submitted to this Court.
 . . .

The process is an extensive one where, as I've already commented, I will have access to the information collected by our social worker, so we'll have the developmental history and personal history.  In this particular case, I also received, as part of the Court order, school records and correctional records, and those -- an analysis of those were included in the written report.  I also had interviews with Mr. Woodall talking about him and trying to understand him, as well as going through a rather extensive battery of tests that were designed to measure intelligence, educational skills, any indications of any kind of perceptual motor or neurological problems, personality tests.

TE 11 at 1519-22.

70

Appellant's claims of error in failing to hold a competency hearing and in failing to find Appellant mentally retarded should have been raised on direct appeal . We note, however, the trial court, *sua sponte*, ordered a mental health evaluation of Appellant at Kentucky Correctional Psychiatric Center as a "precaution."  Dr. Richard Johnson's evaluation revealed that Appellant was competent to stand trial, and there was no evidence of mental retardation.  Furthermore, nothing in the record indicates Appellant is mentally retarded or is incompetent, and his allegations supporting this claim are speculative.

*Woodall*, 2005 WL 3131603 at *1.

The Magistrate Judge concluded that Woodall procedurally defaulted this claim. However, in its opinion, the Kentucky Supreme Court merely stated that the claim was not properly raised on direct appeal.  It is unclear, however, that the Kentucky Supreme Court decided to reject the claim because of a procedural error.  To preclude review by this Court, "there must be unambiguous state-court reliance on a procedural default."  *Bowling*, 344 F.3d at 499.  It is the opinion of this Court that the Kentucky Supreme Court did not unambiguously rely on procedural default.  While it noted the default, it did not clearly hold that procedural default was the basis of its rejection of the claim.  Rather, a plausible interpretation of the opinion is that while the Kentucky Supreme Court noted the procedural default, it based its rejection of the claim entirely on the its substance.  This Court must substantively review the claim.  *Id.*

The trial court ordered an evaluation of Woodall's competency.  Dr. Johnson concluded that Woodall was competent.  Woodall has not presented this Court with any evidence that should have caused the trial court or Woodall's trial counsel to question the validity of this finding at the time of his trial.  While Woodall claims that he was incompetent to assist in his own defense, the record suggests otherwise.  Woodall appeared cooperative during Dr. Johnson's evaluation.  He seemed to understand the questions and gave responsive answers during his plea.  Moreover, none of Woodall's counsel have stated that Woodall was unable to

71

provide them with information necessary to assist in their representation.  The only evidence relied on by Woodall concerns a "mental breakdown" he suffered in 2002 after the Kentucky Supreme Court affirmed his death sentence.  This fact is not evidence of incompetency at the time of trial.  Rather, it suggests that Woodall experienced difficulty in coping with the reality of his impending execution.

Citing *Rees v. Peyton*, 384 U.S. 312 (1966) (per curiam), Woodall also suggests that the Court's failure to conduct a competency hearing on collateral review has violated his due process rights.  *Rees* involved an entirely different set of facts.  In *Rees*, the petitioner's counsel filed a petition for certiorari with the United States Supreme Court seeking review of the dismissal of his habeas petition in the lower court.  A month after the petition had been filed, the petitioner asked his counsel to withdraw it.  The Supreme Court ordered a competency hearing before it disposed of the petition because competency to dispose of the habeas proceedings was directly at issue.  Woodall has not made any credible showing that his competency is directly at issue in these habeas proceedings.

The Kentucky Supreme Court's resolution of this claim was not contrary to or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; nor did it result from an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

## M.   MENTAL RETARDATION

Woodall's fourteenth claim is that the trial judge erred in failing to find him mentally retarded.  He argues that Dr. Johnson's assessment that he has an intelligence quota of 70 to 79 could place him within the five-point margin of error of being mentally retarded.  He has also

72

submitted the affidavit of his trial counsel in which she states that she thinks that she may have once seen something in Woodall's school records that indicates he had an I.Q. of 68. That report has not been placed before the Court nor has Woodall chronicled any efforts he has taken to attempt to locate the report.

> The Kentucky Supreme Court rejected this argument as follows:

> Appellant's claims of error in failing to hold a competency hearing and in failing to find Appellant mentally retarded should have been raised on direct appeal. We note, however, the trial court, *sua sponte*, ordered a mental health evaluation of Appellant at Kentucky Correctional Psychiatric Center as a "precaution." Dr. Richard Johnson's evaluation revealed that Appellant was competent to stand trial, and there was no evidence of mental retardation. Furthermore, nothing in the record indicates Appellant is mentally retarded or is incompetent, and his allegations supporting this claim are speculative.

*Woodall*, 2005 WL 3131603 at *1.

Because the Magistrate Judge found this claim was procedurally defaulted, he did not review it substantively. This Court finds the Kentucky Supreme Court's resolution of this claim ambiguous. While the Court stated that this claim should have been raised on direct appeal, it is unclear to this Court whether the Kentucky Supreme Court actually enforced the procedural bar in this instance or simply pointed out that the claim should have been raised earlier. As such, this Court will review the claim on its merits. *Bowling v. Parker*, 344 F.3d at 499.

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that the execution of the mentally retarded constitutes cruel and unusual punishment in violation of the Eighth Amendment. The Supreme Court acknowledged that disagreement will often arise "in determining which offenders are in fact retarded" and left to the states the task of defining mental retardation and "developing appropriate ways to enforce th[is] constitutional restriction." *Id.* at 317 (internal quotation marks omitted). Kentucky chose to adopt a bright-line test for

73

identifying mentally retarded defendants.  Kentucky Revised Statute § 532.130(2) provides that a

defendant with an intelligence quotient of seventy or below is considered "seriously mentally

retarded."  The statute itself does not reference a margin of error or provide for consideration of

intelligence within a range.  It is a bright-line rule.  *Id.*

In *In re Bowling*, 422 F.3d 434, 437 (6th Cir. 2005), the Sixth Circuit rejected the same

"margin of error" argument advanced by Woodall.

> Bowling argues that this court should not consider the absolute scores on these I.Q.
> tests, but instead apply a five-point margin of error.  The five-point margin of error
> does place one of Bowling's seventh-grade scores below the statutory cutoff.
> However, Bowling does not justify the five-point margin of error with any
> explanation nor does the margin of error appear to derive from any particular source.
> In addition, there is no indication that the psychologists who administered the I.Q.
> tests to Bowling would not have already considered the adequacy and accuracy of
> the testing mechanisms in calculating his scores or in using these instruments for
> evaluation in the first place.  *See United States v. Roane*, 378 F.3d 382, 409 (4th Cir.
> 2004) (in rejecting the argument that defendant's I.Q. score should be considered
> within the range for those with mental retardation because of I.Q. score variations,
> the court observed that the psychologist's care in calculating a score "belies the
> suggestion that [the psychologist's] analysis did not account for possible variations
> in his testing instrument").

> Under either Kentucky law or *Atkins*, Bowling has failed to establish a prima facie
> case on his mental retardation claim.  None of his I.Q. scores falls below the cutoff
> of 70 established by the Kentucky statute.  Evidence that he has limitations in
> functioning does not show that he is mentally retarded; rather, these limitations are
> just as indicative of the other psychological disorders from which he suffers as they
> are of low level intellectual functioning. Thus, we deny Bowling's application.

*Id.; see also Green v. Johnson*, 515 F.3d 290, 300 (4th Cir. 2008) (holding that *Atkins* does not

require a margin of error consideration).  The Kentucky Supreme Court did not unreasonably

apply *Atkins* in deciding that Woodall is not mentally retarded.

Additionally, Woodall has not presented any credible evidence of an intelligence score

below 70.  All he has put before this Court is an affidavit from his former trial counsel stating

that she believes that she may have seen a score of 68 in his file.  There is no explanation why

that test cannot be located or what efforts Woodall has taken to locate it.  Even if the report was

located, however, it would not alter this Court's conclusion.  At least three of the intelligence

tests given to Woodall over the years place him at or above a score of 70.  A single score below

70 would not automatically preclude execution.  *See Woods v. Quarterman*, 493 F.3d 580,

584-87 (5th Cir. 2007) (holding that where the petitioner had four I.Q. scores above 70 and one

score below 70, the state court was not unreasonable in concluding that the petitioner failed to

prove that he suffered from subaverage intellectual functioning).

In sum, the state court's conclusion that Woodall failed to prove by a preponderance of

the evidence that he is mentally retarded is not contrary to *Atkins*.  Woods can cite no materially

indistinguishable case decided differently by the Supreme Court.


**N.    INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS**

In claims fifteen through twenty-three, Woodall argues that his trial counsel were

ineffective.  Specifically, he asserts that his trial counsel failed to:  1) request a competency

hearing; 2) argue that Woodall is ineligible for the death penalty due to mental retardation; 3)

properly advise Woodall on his guilty plea; 4) properly support their motion for a continuance;

5) utilize evidence of psychosis and disassociation; 6) investigate genetic predisposition to

mental illness; 7) obtain additional neurological testing; 8) properly present evidence of

Woodall's fecal incontinence; and 9) adequately explain the conditions of  Woodall's

upbringing.

The Court agrees with the Magistrate Judge that none of these claims merits issuance of a

writ.  However, additional analysis is necessary to support the Court's conclusion.

The Sixth Amendment guarantees a criminal defendant the assistance of an attorney whose performance ensures a fair trial and a reliable result.  *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984).  To prevail on an ineffective-assistance claim, a convicted defendant must prove that 1) counsel's performance was deficient, and 2) the deficiency was prejudicial to the defense.  *Id.* at 687.  To satisfy the deficiency prong of the test, the defendant must prove that "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  The defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that "under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689 (quoting *Michael v. Louisiana*, 350 U.S. 91, 101 (1955)).  The reviewing court's assessment must consider the circumstances of the particular case at the time of the challenged conduct.  *Id.* at 690.

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91.

"[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution."  *Id.* at 691.  The standard for prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  In the context of the imposition of the death sentence, "the question is whether there is a reasonable probability that,

76

absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.

Woodall's first argument is that his counsel should have requested a competency hearing. The Kentucky Supreme Court rejected this argument as follows.

> Woodall argues that his first counsel, Williams, performed incompetently when he failed to request a competency hearing.  In affirming the denial of his RCr 11.42 motion, the Kentucky Supreme Court found the claim without merit:  Appellant first argues trial counsel was ineffective for failing to request a competency hearing . . . As stated above, Dr Johnson found no evidence of incompetence . . . Consequently, failing to pursue these avenues of trial strategy is not ineffective assistance of counsel.

*Woodall*, 2005 WL 3131603 at \*1.

The trial court *sua sponte* ordered Dr. Johnson, a psychologist at the Kentucky Correctional Psychiatric Center, to perform an evaluation of Woodall.  Dr. Johnson evaluated Woodall from February 3, 1998, through February 17, 1998.  Dr. Johnson found Woodall competent to stand trial and reported those findings back to the trial court and counsel.

Counsel cannot be held responsible for procuring a second expert simply because one expert reached a result that Woodall now asserts is inaccurate.  *See Beans v. Black*, 757 F.2d 933, 936 (8th Cir. 1985) (holding that counsel's actions were not objectively unreasonable for failing to procure a second expert on petitioner's competence when first expert found petitioner competent to stand trial).  It was reasonable for counsel to end his psychological inquiry of Woodall's competency with Dr. Johnson's conclusions.  *Clark v. Mitchell*, 425 F.3d 270, 285-86 (6th Cir. 2005) ("It was not unreasonable for Clark's counsel, untrained in the field of mental health, to rely on the opinions of these professionals."); *Lewis v. Alexander*, 11 F.3d 1349, 1353 (6th Cir. 1993) (holding that an attorney's reliance on the evaluation of the defendant's medical records by a professional he knew

77

and trusted was not a violation of the Sixth Amendment); *Sidebottom v. Delo*, 46 F.3d 744, 753 (8th

Cir. 1995) (finding that defense counsel did not render ineffective assistance by not seeking a

"second opinion" where counsel reasonably relied on the results of a psychological examination);

*Poyner v. Murray*, 964 F.2d 1404, 1419 (4th Cir. 1992) ("The mere fact that . . . counsel did not

shop around for a psychiatrist willing to testify to the presence of more elaborate or grave

psychological disorders simply does not constitute ineffective assistance.").

      Woodall next claims that his counsel performed deficiently in failing to argue that he is

mentally retarded.  The Kentucky Supreme Court resolved this claim as follows:

> Appellant first argues that trial counsel was ineffective for failing to request a
> competency hearing and failing to raise mental retardation as an issue.  As stated
> above, Dr. Johnson found no evidence of incompetence or mental retardation.
> Consequently, failing to pursue these avenues of trial strategy is not ineffective
> assistance of counsel.

*Woodall*, 2005 WL 3131603 at *2-3.

      Several intelligence tests placed Woodall's  I.Q. at 70 or above.  Specifically, Dr.

Johnson reviewed Woodall's scholastic records and did not indicate finding any intelligence

score that placed Woodall below 70.  In sum, Dr. Johnson stated,

> Questions have been raised about his mental functioning, particularly whether or not
> there is the presence of any mental retardation.  The results of the evaluation at
> KCPC which included review of historical school and correctional records did not
> reveal any evidence of mental retardation IQ scores of less than 70 and deficits in
> adaptive behavior functioning).  .  .  .  His psychological testing placed him in the
> upper part of the borderline range (IQ scores of 70-79). . . . Mr. Woodall was seen
> as being capable of bearing criminal responsibility for his actions if found guilty on
> his current charges.

TE 13, defendant's Ex. 6.  Trial counsel acted reasonably in relying on Dr. Johnson's

assessment.  Nothing in the record indicates that they should have questioned Dr. Johnson's

determination that Woodall is not severely mentally retarded.

Woodall claims his trial counsel were ineffective because they allegedly bullied and coerced Woodall into accepting an open guilty plea.  The Kentucky Supreme Court concluded on direct appeal that the plea was voluntarily.  Therefore, they refused to consider whether counsel were ineffective in this regard.  *See Woodall*, 2005 WL 3131603 at *2.  This Court has already determined that the Kentucky Supreme Court's decision that the plea was voluntary was not in error.  *See supra* Part J.  Additionally, the Court observes that even if counsel did "bully" Woodall into accepting a guilty plea, the evidence against Woodall would have almost certainly resulted in a guilty verdict and a subsequent sentence of death.  Indeed, it appears that counsel made a sound strategic choice in counseling Woodall to plead guilty.  This choice likely was the best chance Woodall had to escape death.  Thus, there is not a "a reasonable probability that, but for" Woodall's guilty plea "the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. at 694.

Woodall also argues that his trial counsel were deficient for failing to present additional mental health expert testimony in support of their motion for a third continuance prior to the April 1998 trial date.

The Kentucky Supreme Court rejected this claim as follows:

Appellant claims counsel was ineffective for failing to present additional mental health expert testimony in support of a third continuance prior to the April 1998 trial date.  Counsel presented the testimony of one psychiatric expert, but Appellant claims it was not enough.  When claiming ineffective assistance, Appellant may not base his claims merely on the fact that a defense tactic was unsuccessful.  *Strickland*, supra at 690. We find the testimony of one expert on the subject to be sufficient and reasonable assistance of counsel.

*Woodall*, 2005 WL 3131603 at *3.

Woodall's counsel did present an expert in support of their motion, Dr. Eric Drogin, a

psychologist and attorney.  TE 3 at 306.  Dr. Drogin testified before the trial court at length.  In

the end, the trial court found Dr. Johnson's assessment of Woodall more reliable than Dr.

Drogin's assessment.  As a result, the trial court did not find that additional testing was

reasonably necessary under the circumstances.  Woodall's counsel were unsuccessful.  They did

not, however, perform so deficiently that Woodall's constitutional rights were violated.  *See*

*Strickland*, 466 U.S. at 690.

Woodall also claims that his counsel were ineffective for failing to present an insanity

defense.  Dr. Johnson's report concluded that "there was not any evidence of a thought disorder

or pshychosis" present in Woodall.   TE 13, defendant's Ex. 6.  Although it appears that Woodall

suffered from some mental problems, the expert opinion was that he was not legally insane.

Woodall's actions in attempting to cover-up the crime after the fact also indicate that he was able

to appreciate the wrongfulness of his actions and that he understood his behavior violated the

law.  Woodall also appeared able to cooperate with his counsel and Dr. Johnson.  Woodall's

counsel, however, did not exclusively rely on Dr. Johnson.  They had Dr. Eric Drogin meet with

Woodall on two occasions and review Dr. Johnson's report.  Although Dr. Drogin had questions

about the report, he was unable to conclude whether Woodall suffered from some type of

psychosis.  Given Dr. Johnson's report, Woodall's actions after the crime, and the overwhelming

evidence of guilt, counsel made a wise and strategic decision to recommend that Woodall forgo

an insanity defense and plead guilty.  *See Lundgren v. Mitchell*, 440 F.3d at 773.

Additionally, Woodall claims that his counsel were ineffective for failing to link

Woodall's mental condition to his genetic history.  Evidence was presented at trial that

Woodall's mother and brother experienced mental problems over the years.  The Commonwealth

80

did not attack Dr. Johnson's conclusions that Woodall had suffered from a personality disorder and borderline mental functioning.  While counsel might have been able to produce additional evidence that other members of Woodall's maternal family have mental problems, their failure to do so cannot be said to have prejudiced Woodall.  The jury certainly could have inferred that genetically the Woodall family has a history of mental problems from the testimony about Woodall's mother and brother.  While additional testimony might have bolstered the connection, it is unlikely it would have changed Woodall's sentence.  This is especially true since Woodall was not raised around these additional relatives.  Woodall's mother was adopted as a young child and there is no evidence that Woodall had any contact with these other individuals as a child.  *See Harbison v. Bell*, 408 F.3d 823, 830 (6th Cir. 2005) (holding that trial counsel's failure to introduce the fact that the petitioner's sister murdered her children and then committed suicide was not ineffective because there was no evidence presented during the habeas proceeding regarding how those events affected the petitioner).

Woodall also claims that his counsel were deficient in failing to have a PET scan performed.  Woodall's counsel attempted to secure funding and a continuance to obtain the testing.  Counsel explained to the trial court that he had not obtained it earlier because he did not believe that it was going to be necessary in light of his then-planned defense of mental retardation.  After Dr. Johnson's examination revealed that Woodall is not mentally retarded, counsel decided to request the PET testing in hopes of discovering a different defense.  To support his request, Woodall's trial counsel consulted with a Dr. Drogin.  Counsel offered Dr. Drogin's testimony to the trial court.  After considering Dr. Drogin's testimony and Dr. Johnson's report, the trial court determined that additional testing was not reasonably necessary.

Woodall's counsel did not perform deficiently.  The simple fact is that the trial court decided against Woodall on this point.  The fact that counsel lost this argument, however, does not mean that they were ineffective.  *See Strickland*, 466 U.S. at 690.

Woodall claims that his counsel were defective in fully explaining the conditions of his upbringing including his fecal incontinence.  The Kentucky Supreme Court rejected this claim as follows:

> Appellant acknowledges defense counsel offered the jury evidence of Appellant's fecal incontinence, squalid upbringing, and childhood sexual abuse. Appellant argues, however, that defense counsel was ineffective in convincing the jury that Appellant did not deserve the death penalty. The record reflects that defense counsel acted reasonably, and advocated Appellant's plight as appropriate under the circumstances.  Furthermore, even if defense counsel had been a more zealous advocate of this evidence, it still would not create a reasonable probability the jury would have returned a lesser sentence.   Accordingly, we find no ineffective assistance of counsel.

*Woodall*, 2005 WL 3131603 at *3

Capital defense counsel has an affirmative duty to pursue mitigation evidence and to conduct an appropriate investigation into potential mitigating factors:

> Counsel's constitutional duty to investigate a defendant's background in preparation for the sentencing phase of a capital trial is "well-established." *Coleman v. Mitchell*, 268 F.3d 417, 449 (6th Cir. 2001); *see also Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997). The "prospect of being put to death unless counsel obtains and presents something in mitigation" magnifies counsel's responsibility to investigate. *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999). And notwithstanding the deference *Strickland* requires, neither this court nor the Supreme Court has hesitated to deem deficient counsel's failure to fulfill this obligation.
>  . . .
>
> "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms.'" *Id.* at 523 (quoting *Strickland*, 466 U.S. at 688) . . . . More recent ABA Guidelines, which the United States Supreme Court has recognized as reflecting prevailing professional norms, emphasize that "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and

82

evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1 (C), p. 93 (1989) and adding emphasis).

*Lundgren v. Mitchell*, 440 F.3d at 770-71 (quoting *Harries v. Bell*, 417 F.3d 631, 637-38 (6th Cir. 2005)).

There was ample evidence presented to the jury that Woodall experienced a dysfunctional childhood plagued by poverty and instability.  Several witnesses testified about the poor condition of his home, his mother's depression and weight problems, the absence of his father, his fecal incontinence, and the stress his brother's psychological problems placed on the family.   He now argues that counsel should have presented more detailed and specific testimony about these areas.  However, "a petitioner cannot establish ineffective assistance by identifying additional evidence that could have been presented when that evidence is merely cumulative" to that already admitted.  *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002).  The additional evidence about Woodall's upbringing that he now argues should have been presented is cumulative to that elicited at trial.

Lastly, Woodall argues that trial counsel should have elicited additional testimony concerning the sexual abuse Woodall's mother inflicted upon him when she placed soap into his rectum.  The Kentucky Supreme Court held that Woodall's counsel performed sufficiently in presenting testimony on this area.  *Woodall*, 2005 WL 3131603 at *3.

Dr. Ricky Spears testified at trial that placing soap in Woodall's rectum was a form of sexual abuse and that those who are sexually abused are more likely to become sexual offenders.  TE 11 at 1490-92.  However, all of the trial lay witnesses that testified about this subject explained that Woodall's mother placed the soap in Woodall's rectum because she

believed that it would help alleviate his constipation and might improve his problems with fecal incontinence.  Thus, the overall agreement was that her intentions were not sexual in nature and her desire was to help, not harm, her son.  Taking into account the circumstances surrounding these events, the Court finds that counsel made a strategic decision to limit the amount of testimony that they presented about the sexual abuse.

In conclusion, the Kentucky Supreme Court's resolution of Woodall's ineffective assistance of counsel claims was not contrary to or an unreasonable application of *Strickland*, nor did it result from an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

## O.    JUROR'S CONSULTATION OF THE BIBLE

Woodall's twenty-fifth and twenty-sixth claims for relief are that his constitutional rights were violated when Juror Hawkins consulted Bible verses about the death penalty during deliberations.  She also avers that she printed some verses off of the internet and placed them in the jury room.  She is uncertain whether any other jurors looked at them.  Woodall has not presented evidence from any other jurors to support this claim.  Woodall did not raise this claim on direct appeal or in his RCr 11.42 claim.  It was raised for the first time by Woodall in a CR 60.02 motion.

The Kentucky Supreme Court held as follows:

Thus, for the reasons set forth herein, Appellant's CR 60.02 claim is procedurally barred since the issue set forth within it should have been raised in his RCr 11.42 motion.  *Gross, supra*, at 857 ("The language of RCr 11 .42 forecloses the defendant from raising any questions under CR 60.02 which are 'issues that could reasonably have been presented' by RCr 11 .42 proceedings .").   Even if Appellant's claims were not procedurally barred, relief would not be available, as his allegations are

84

without merit. . . . In this case, aside from Juror H's uncorroborated affidavit, there is no evidence establishing what was actually brought into the jury room or that any other juror was affected by the presence of these materials. Juror H stands alone in her allegations, and we find such singular evidence to be insufficient to prove juror misconduct in this instance.  Conversely, there was sufficient evidence for the jurors to reach an impartial, unanimous decision imposing the death penalty, especially in light of Appellant's voluntary guilty plea to the heinous murder of Sarah Hansen. The relevant public policy concerns of finality of a jury verdict, protecting jurors from continued post verdict interference, and maintaining the integrity of the jury trial system would be undermined if lone jurors were routinely permitted to second-guess the deliberative process once the trial is over.   After the trial is over, the collective jury decisional process no longer exists.  Accordingly, we find no abuse of the trial court's discretion, and agree that RCr 10.04 bars the proffered juror testimony in this case.

*Woodall*, 2005 WL 2674989 at *1-2.

The Magistrate Judge concluded that this Court was barred from reviewing these claims because they were procedurally defaulted.  In the alternative, the Magistrate Judge concluded that any error that occurred was harmless.  The Court agrees with the Magistrate Judge's conclusions.  The Kentucky Supreme Court explicitly found the that these claims were procedurally barred and unquestionably enforced the bar.  Woodall has not shown good cause in this proceeding why he was prevented from raising the claims properly in state court nor has he proffered any evidence to suggest that in absence of the juror misconduct the verdict would have been different.  Even Juror Hawkins did not aver that her verdict would have been different but for the Bible verses she considered.  She only stated that the verses played a part in her decision.    The Kentucky Supreme properly rejected these claims.

## P.    PROPORTIONALITY REVIEW

Woodall contends that the Kentucky Supreme Court's proportionality review was unconstitutional.  Woodall first argues that the Kentucky Supreme Court only compared his sentence to other crimes where the death penalty was imposed, but should have compared it to

similar crimes where the death penalty was not imposed.  He also complains that the he did not

receive access to the proportionality data compiled and relied on by the Kentucky Supreme

Court.

       Kentucky's proportionality statute provides that the court shall determine "whether the

sentence of death is excessive or disproportionate to the penalty imposed in similar cases,

considering both the crime and the defendant."  KY. REV. STAT. § 532.075(3)(c).  To aid the

court in its proportionality determination, KY. REV. STAT. § 532.075(6) requires the Chief

Justice of the Kentucky Supreme Court to assign to an administrative assistant who is an

attorney the tasks of accumulating the records of all Kentucky felony offenses in which the

death penalty was imposed after January 1, 1970, providing the court with summaries of those

cases, and compiling any other data requested by the Chief Justice for the purpose of

determining the validity of the death sentence.  The Kentucky Supreme Court has held that a

capital defendant does not have the right to the production of the court's proportionality

research files for use in litigation.  *Ex parte Farley*, 570 S.W.2d 617 (Ky. 1978); *Skaggs v.*

*Commonwealth*, 694 S.W.2d at 682 (holding that "public advocate was not entitled to data

compiled for this court pursuant to KRS § 532.075(6)(a), (b) and (c)").

       Comparative proportionality review on appeal is performed to ensure that a given death

sentence is not disproportionate relative to other sentences imposed for similar crimes.

Comparative proportionality, as opposed to inherent proportionality (which measures the

proportionality of a sentence to the severity of the crime), is not required by the Constitution,

*Pulley v. Harris*, 465 U.S. 37, 43-44 (1984); *Bowling v. Parker*, 344 F.3d at 521; *Cooey v.*

*Coyle*, 289 F.3d 882, 928 (6th Cir. 2002); *see also Coe v. Bell*, 161 F.3d 320, 352 (6th Cir.

1998) (finding no Eighth Amendment right to proportionality review), but if a state adopts a scheme for such review, it must comport with due process. *Bowling v. Parker*, 344 F.3d at 521; *Greer v. Mitchell*, 264 F.3d at 691. The state court's failure to perform a statutory proportionality review is not reviewable in federal court as an issue of state law. *Pulley v. Harris*, 465 U.S. at 41; *Bowling v. Parker*, 344 F.3d at 521. Instead, federal habeas corpus review is limited to whether the state court engaged in a good faith proportionality review. *Walton v. Arizona*, 497 U.S. 639, 655-56 (1990), *overruled in part on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). Citing the lack of direction in the statute regarding how the Kentucky Supreme Court is to conduct its proportionality review, the Sixth Circuit has expressed grave doubts regarding whether the statute even creates a liberty interest giving rise to a federal due process claim for alleged procedural lapses by the state supreme court in its review. *Bowling v. Parker*, 344 F.3d at 521-22.

In *Bowling v. Parker*, the Sixth Circuit considered and rejected the identical argument advanced here by Woodall:

> Bowling argues that the Kentucky Supreme Court only compared Bowling's sentence to other crimes where the death penalty was imposed, but should have compared Bowling's sentence to similar crimes where the death penalty was not imposed. There is no clear support in Kentucky law for the proposition that the Kentucky Supreme Court must also consider those additional cases. In fact, Bowling notes this, stating that "Kentucky has limited review to cases in which the death penalty was imposed." Appellant Br. at 121.
>
> Bowling's recognition that Kentucky law does not require consideration of those additional cases reveals that he is actually arguing that Kentucky has an ineffective framework for assessing proportionality rather than a claim that Kentucky misapplied its own framework. This forecloses Bowling's due-process argument, however, for there is no violation of due process as long as Kentucky follows its procedures. We note that we also have specifically rejected this type of challenge to Ohio's proportionality statutes.

*Id.* (citing *Buell v. Mitchell*, 274 F.3d 337, 368-69 (6th Cir. Ohio 2001)).

Woodall also complains about the Kentucky Supreme Court's refusal to share its underlying data. In determining that Woodall's sentence was not excessive or disproportionate, the Kentucky Supreme Court "considered all the cases in which the death penalty was imposed since 1970 involving both the crime and the defendant." *Woodall*, 63 S.W.3d at 133. Those cases should all be reported. Woodall was free to examine the cases himself and make any arguments he deemed appropriate from that examination. There is no constitutional requirement that a court must share its legal research with an appellant.

Woodall has failed to show that the Kentucky Supreme Court did not engage in a good faith proportionality review. Accordingly, this claim is denied.

## Q.   NON-STATUTORY AGGRAVATORS

Woodall's twenty-eighth claim is that trial court considered non-statutory aggravators in accepting the jury recommendation that Woodall be sentenced to death. Specifically, Woodall alleges that the trial judge considered Woodall's lack of remorse and the heinous nature of the crime. In rejecting this claim the Kentucky Supreme Court explained:

> The trial judge properly relied on nonstatutory aggravating factors to enhance the sentence. Woodall claims that such use is unconstitutional. Similar arguments have been rejected by this Court in *Matthews v. Commonwealth*, Ky., 709 S.W.2d 414 (1986); *Mills v. Commonwealth*, Ky., 996 S.W.2d 473 (1999) and *Tamme v. Commonwealth*, Ky., 973 S.W.2d 13 (1998). The use of nonstatutory aggravating circumstances is permissible as long as the jury makes the required finding that at least one statutory aggravating circumstance exists. We find no error in this respect.

*Woodall*, 63 S.W.3d at 132.

The Court adopts the Magistrate Judge's Report and Recommendation with respect to this claim. Additionally, the Court observes that as noted by the Kentucky Supreme Court,

Kentucky law does not bar the trial judge from considering non-statutory aggravators in deciding whether to accept or reject the jury's recommendation of death.  Furthermore, the United States Supreme Court has refused to bar even a jury's consideration of non-statutory aggravators so long as a statutory aggravator exists to support the decision.  *See Barclay v. Florida*, 463 U.S. 939, 966-67 (1983) (Stevens, J., concurring) ("[A]lthough a death sentence may not rest solely on a nonstatutory aggravating factor, the Constitution does not prohibit consideration at the sentencing phase of information not directly related to either the statutory aggravating or statutory mitigating factors, as long as that information is relevant to the character of the defendant or the circumstances of the crime.").

**R.      EXECUTION OF THE INCOMPETENT**

Woodall claims that he is not competent to be executed.  The Magistrate Judge determined that this claim is not yet ripe.  Woodall does not object to the Magistrate Judge's finding.  Accordingly, it stands.

**S.      CUMULATIVE ERROR**

Woodall's thirtieth and final claim is that the cumulative effect of the errors at trial rendered his trial fundamentally unfair in violation of due process.  The Kentucky Supreme Court resolved this claim as follows:  "There is no basis to claim cumulative error in this case. We have found no error that has existed in any of the other assignments of error by Woodall, and consequently we find no cumulative error.  *Woodall,* 63 S.W.3d at 134 (citing *Sanders v. Commonwealth*, 801 S.W.2d 665 (1991)).  The Supreme Court has repeatedly stated that fundamentally unfair trials violate due process.  *See, e.g.*, *Riggins v. Nevada*, 504 U.S. 127 (1992).  However, "the law of this Circuit is that cumulative error claims are not cognizable on

89

habeas because the Supreme Court has not spoken on this issue."  *Williams v. Anderson*, 460

F.3d 789, 816 (6th Cir. Ohio 2006); *see also, Moore v. Parker*, 425 F.3d 250, 256 (6th Cir.

2005) (discussing cumulated evidentiary errors).  Accordingly, this claim does not merit

issuance of the writ.

## V.  CERTIFICATE OF APPEALABILITY

In the event that Woodall wishes to appeal any aspect of this Court's decision, he is

required to obtain a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1)(a); FED. R.

APP. P. 22(b).  A district court must issue or deny a COA and can do so even though the

petitioner has yet to make a request for such a certificate.  *Castro v. United States*, 310 F.3d

900, 903 (6th Cir. 2002) ("Whether the district court judge determines to issue a COA along

with the denial of a writ of habeas corpus or upon the filing of a notice of appeal, the district

judge is always required to comply with § 2253(c)(2)&(3) by 'indicat[ing] which specific issue

or issues satisfy the denial of a constitutional right.' 28 U.S.C. § 2253(c)(2).").

A COA may issue "only if the applicant has made a substantial showing of the denial of

a constitutional right." § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. at 483.  The Supreme Court

has recognized that the current version of § 2253 codified the standard set forth in *Barefoot v.

Estelle*, 463 U.S. 880, 894 (1983) and stated:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial
> showing of the denial of a constitutional right, a demonstration that, under *Barefoot*,
> includes showing that reasonable jurists could debate whether (or, for that matter,
> agree that) the petition should have been resolved in a different manner or that the
> issues presented were "'adequate to deserve encouragement to proceed further.' "
> *Barefoot*, *supra*, at 893, and n. 4 . . . ("sum[ming] up" the " 'substantial showing' "
> standard).

*Slack v. McDaniel*, 529 U.S. at 483-84.  The Supreme Court further noted that the standard used

to govern the COA analysis depended upon whether the lower court dismissed the petition after a substantive review of the merits, or merely dismissed the petition on procedural grounds.  In the case of the former, the Court held "the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.* at 484.  When a district court denies such a motion on procedural grounds without addressing the merits of the motion, a certificate of appealability should issue if the petitioner shows "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*  When a plain procedural bar is present and the district court is correct to invoke it to dispose of the matter, a reasonable jurist could not conclude either that the court erred in dismissing the petition or that the petitioner should be allowed to proceed further.  *Id.* at 484-85.  In such a case, no appeal is warranted.  *Id.* at 485.

Where this Court ruled upon the merits of Woodall's arguments, it has reexamined the merits of the issues in light of *Slack's* more "straightforward" analysis to determine whether reasonable jurists could find its analyses with respect to these grounds debatable or wrong. With the exception of Woodall's claim number five that the jury instructions impermissibly implied required unanimity with respect to mitigating circumstance, it finds that none of the issues merits a COA.  The claims presented in the petition were clear-cut, easily addressed, and provided no bases for granting federal habeas relief.  The Court is persuaded that reasonable jurists would not debate the correctness of its assessment of these claims.  The basis of the Court's decision to grant a COA with respect to claim number five is explained in the body of

this Opinion.

## VI. ORDER

The court **ADOPTS** the Magistrate Judge's Report and Recommendation with the modifications discussed above.

**IT IS ORDERED** that Petitioner Robert Keith Woodall's application for a writ of habeas corpus (DN 1) is **GRANTED IN PART** and **DENIED WITH PREJUDICE IN PART**.  The application is **GRANTED** as to 1) Petitioner's claim that the trial court's failure to give a no adverse inference instruction as requested by Petitioner violated his Fifth Amendment right to remain silent and his Fourteenth Amendment right to a fair trial and 2) the trial Court's failure to recognize that Petitioner had a right to make a *Batson* challenge to the exclusion of an African-American juror violated the due process and equal protection clauses of the Fourteenth Amendment.  The application is in all other respects **DENIED.**

**IT IS FURTHER ORDERED** that Petitioner Robert Keith Woodall's sentences of September 4, 1998, to death and life in prison for the rape, murder, and kidnapping of Sarah Hansen are **VACATED**, and this matter is **REMANDED** to the state trial court for further proceedings.

**IT IS FURTHER ORDERED** that a certificate of appealability shall issue with respect Petitioner's claim that the jury instructions impermissibly implied required unanimity with respect to mitigating circumstances.

Date: